*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

   *v.*

SCOTTY LEE HUDSON,

        *Defendant-Appellant.*

No. 04-5096

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 02-00167—William J. Haynes, Jr., District Judge.

Argued: February 4, 2005

Decided and Filed: April 22, 2005

Before: SILER, COLE, and CLAY, Circuit Judges.

———————

**COUNSEL**

**ARGUED:** Hugh M. Mundy, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Philip H. Wehby, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Ronald C. Small, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Philip H. Wehby, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

    CLAY, J., delivered the opinion of the court, in which COLE, J., joined. SILER, J. (p. 17), delivered a separate opinion concurring in part and dissenting in part.

———————

**OPINION**

———————

    CLAY, Circuit Judge. Defendant Scotty Lee Hudson, who pled guilty to being a felon in possession of a firearm, *see* 18 U.S.C. §§ 922(g)(1) and 924, and to possessing crack cocaine, *see* 21 U.S.C. § 844, but reserved his right to appeal the district court's suppression ruling, appeals the denial of his motion to suppress crack cocaine discovered on his person and a gun discovered in the home in which he resided. Hudson argues that the officers who stopped the car he occupied and searched his person lacked reasonable suspicion to support the temporary seizure and pat-down. In addition, Hudson argues that Jamie Potts, a woman the police suspected was his girlfriend, lacked apparent authority to consent to the search of the home and, in any event, did not consent voluntarily. Consequently, Hudson maintains that both searches were violations of the Fourth Amendment and the evidence they uncovered must be suppressed. Finally, relying on *United States*

*v. Booker*, 543 U.S. —, 125 S. Ct. 738 (2005), Hudson submits that he is entitled to re-sentencing on the grounds that the Federal Sentencing Guidelines are now advisory. We REVERSE the district court's denial of the suppression motion as to the crack cocaine but AFFIRM its denial of the suppression motion as to the gun. For present purposes, this disposition moots Hudson's sentence for cocaine possession. Regarding Hudson's sentence for possessing a firearm as a felon, we VACATE the judgment of the district court and REMAND for re-sentencing.

## FACTS

According to the testimony presented at the suppression hearing and the findings of the district court, the facts are as follows. After an armed robbery on August 21, 2000 at the One-Stop market in Gallatin, Tennessee, a witness identified Defendant Hudson from a series of suspect photographs and a warrant was issued for Hudson's arrest. The charge was aggravated robbery. Investigator Glenn Hesson of the Gallatin Police Department undertook to locate Hudson and arrest him but was initially unsuccessful. On September 14, 2001 a colleague of Hesson's passed on an anonymous tip that a woman Hesson suspected to be Hudson's girlfriend, Jamie Potts, worked at the Pantry Market in Gallatin. According to Hesson's testimony, the anonymous informant claimed that on September 14, 2001, Potts would arrive to begin her shift at the market at around 3:00 p.m.,[1] would be driving a red or maroon Ford Taurus and, further, would be accompanied by Hudson. However, as the district court observed, a report Hesson composed following receipt of the tip does not refer to the tipster's prediction that Hudson would accompany Potts to work.

Hesson next contacted the Pantry's manager, David Hollis, in an effort to corroborate the informant's tip. Hollis confirmed that Potts worked at the Pantry and usually arrived ten minutes before her 3:00 p.m. shift began. According to Hesson, Hollis also confirmed that Potts drove a Ford Taurus; Hollis disputed this representation at the suppression hearing, J.A. at 189 ("[I] wouldn't pay no attention to what she drove."), but the district court apparently credited Hesson's testimony. Hollis was unable to confirm or deny Hesson's suspicion that Hudson was Potts's boyfriend and that the two shared a child. In any event, Hesson testified that he came to learn of Hudson and Potts's relationship and their child during his 14 years as a Gallatin police officer.[2]

On the basis of the tip, Hesson's own knowledge, and the confirmations provided by Hollis, Hesson and other Gallatin police officers proceeded to the Pantry in marked and unmarked police cars. At or around 3:00 p.m., a red or maroon Ford Taurus entered the Pantry's parking lot; Potts was the driver and the passengers were one infant and two black males later identified as Hudson and Charles Burford. Out of a concern for their own safety, the officers approached the car with their firearms drawn in a so-called "felony approach." At the suppression hearing, Hesson described how he and his colleagues had earlier agreed to conduct a "felony approach" because they suspected that Hudson might be armed since he had allegedly used a firearm to commit the robbery. According to Hesson, once the officers reached the car they removed Potts, Hudson, and Burford, then patted the three companions down and, finally, placed them in handcuffs. Only after searching and handcuffing the three did the officers confirm each person's identity.

---

[1] The district court attributes this information to the anonymous tip, *see* J.A. at 206, but the testimony at the suppression hearing suggests that it was the Pantry's manager, Mr. Hollis, who informed Hesson of the anticipated time of Potts's arrival on for work on the 14th. *See* J.A. at 186.

[2] Hesson testified that in the course of investigations, he "became acquainted with Mr. Hudson and also with Jamie Potts." J.A. at 51. Hesson further testified: "And during those different investigations of working in the community, I had learned and actually witnessed and seen in the past Mr. Hudson and Ms. Potts together, knowing of their relationship. . . . They were boyfriend/girlfriend and were – had shared a child." *Id.*

Investigator Gail Humes, a six-year veteran of the Gallatin Police Department, conducted the pat-down of Hudson and felt a substance in his pocket she immediately determined was crack cocaine wrapped in plastic baggies.[3] She asked Hudson if the substance was crack cocaine and he responded that it was; she then removed the crack from Hudson's pocket. After the pat-down, Hesson confirmed Hudson's identity – first by asking Hudson, who responded that his name was Scotty Lee Wright, a name Hesson knew to be an alias[4]; and next, by asking Potts and Burford, who both confirmed that he was in fact Hudson. Potts then consented to a search of the Taurus but the officers did not discover any contraband.[5]

Potts and Hesson present differing accounts as to what occurred next. According to Potts, Hesson permitted her to take Hudson's cell phone and the keys to his residence at 211 East Eastland Avenue in Gallatin. Potts then proceeded to the residence in order to retrieve some personal belongings she stored there. Potts testified that she did not live at the East Eastland Avenue residence but received permission from a Ms. Dalton, Hudson's grandmother, to store certain belongings there – belongings she could not fit in the house where she was temporarily residing. (According to Potts, Ms. Dalton leased the Eastland residence. *Id*. at 138.) When she arrived, Potts observed that Hesson had pulled up behind her. According to her testimony, Hesson told her that he could "get [her] for conspiracy, and harboring a fugitive" and that the officers "needed to search [her] house." J.A. at 145. Potts responded that it was not her house, nor was she a renter there, but was present only to "pick up a few things." *Id*. She confirmed that Hudson "stayed" at the residence but asserted that she "did not have the authority to give them to search." *Id*. at 145. Potts further testified that in the meantime another officer arrived at the residence carrying a document Hesson represented as a search warrant. Potts told the officers to "go ahead and search" and that "there was nothing [she] could do if [they] have a search warrant." *Id*. Potts testified that she was distraught when Hesson directed her to sign at the bottom of a page to certify that she was present at the time of the search. Potts signed the form. According to her testimony, Potts repeatedly informed Hesson that she did not live at the residence and could not authorize the search. Further, Potts testified that none of the officers explained the purported search warrant to her; that Hesson flipped the two-page document to the second page and said "sign here"; and that although she might have had an opportunity to read the document, she was hysterical and in a state of shock and simply signed it without reading it.

Hesson's account of the search at 211 East Eastland is starkly different from Potts's. Hesson testified that while all parties were still in the Pantry's parking lot, he asked Potts whether she and Hudson were living together and she said they were. Hesson next inquired whether Potts would consent to a search of the residence. According to Hesson, Potts responded that the officers could "come and search the house." J.A. at 63. Hesson asked Potts where the residence was and Potts replied that it was on East Eastland but, because she had not lived there for very long, she did not remember the number. In any event, Hesson testified, Potts offered to take the officers to the residence and they followed her to it in their cars. According to Hesson's testimony, he told Potts the officers sought evidence related to the aggravated robbery. Once they arrived at 211 East Eastland, Hesson met with Potts in front of the house to discuss the consent form. Hesson testified that he reviewed the form with Potts and then they both signed it. Thereafter, Hesson, Humes, and

---

[3] Humes attributed her familiarity with the substance to her recovery of narcotics on more than 20 occasions prior to her search of Hudson. *See* J.A. at 118-19.

[4] Scotty Lee Wright was actually Hudson's father's name; Hesson knew that Hudson had used his father's name as an alias in the past. *See id*. at 208.

[5] According to Hesson, Potts orally consented and signed a consent form. *Id*. at 61-62. Potts recalls only orally consenting to the car search. *Id*. at 142. The government produced a signed consent form at the suppression hearing and the district court consequently credited Hesson's version of events.

Lamar Ballard conducted a search of the house. Hesson remained with Potts, who had her child in her arms, and Burford, who had accompanied Potts, either remained outside the house or walked away. Humes found a semi-automatic handgun in a cardboard box full of clothes for a small child. According to Humes, Potts remained calm during the search but became upset when she learned the officers had recovered a gun in the room where her baby slept.

Following his arrest, officers advised Hudson of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Hudson agreed to waive his *Miranda* rights and stated in an interview that the cocaine recovered from his pocket was for his own use. Regarding the gun discovered at the residence, Hudson explained that he had been holding it for a friend.

## PROCEDURAL HISTORY

A federal grand jury indicted Hudson on one count of knowingly possessing a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924, and one count of intentionally possessing crack cocaine, in violation of 21 U.S.C. § 844. On March 21, 2003, the district court denied Hudson's motion to suppress the handgun and the crack cocaine. Hudson pled guilty to both charges on June 30, 2003 and reserved his right to appeal the court's denial of his motion to suppress. The district court sentenced Hudson to 53 months on the felon-in-possession charge and 12 months on the cocaine possession charge, to be followed by four years of supervised release. On November 14, 2003, Hudson timely filed a notice of appeal.

## DISCUSSION

In an appeal of the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *E.g.*, *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir.), *cert. denied*, 125 S. Ct. 219 (2004); *United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999). The ultimate questions of whether the police had reasonable suspicion to briefly detain a suspect, probable cause to arrest him, or a reasonable basis to conclude that a third party had authority to consent to a search, are questions of law and we therefore review them *de novo*. *Ornelas v. United States*, 517 U.S. 690 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 275 (2002); *Harris*, 192 F.3d at 584 (holding that whether the police violated the Fourth Amendment is always subject to *de novo* review). However, this Court must give considerable deference to the district court's credibility determinations. *See*, *e.g.*, *United States v. Johnson*, 344 F.3d 562, 567 (6th Cir. 2003).

### I.

We consider first Hudson's claim that the police officers lacked reasonable suspicion to stop and frisk him in the Pantry's parking lot. The government concedes that the officers seized Potts, Hudson, and Burford when the officers approached Potts's car with guns drawn, ordered the group to exit the car, and conducted pat-downs. The parties part ways on whether this admitted seizure was nonetheless reasonable under the Fourth Amendment.

### A.

Where the police "have been unable to locate a person suspected of involvement in a past crime," they may, consistent with the Fourth Amendment, "stop that person, ask questions, or check identification . . . ." *United States v. Hensley*, 469 U.S. 221, 229 (1985); *see also Terry v. Ohio*, 392 U.S. 1 (1968) (approving of such temporary stops where an officer suspects the person is presently engaged in criminal conduct, or soon will be). In addition, where a police officer reasonably suspects "that the persons with whom he is dealing may be armed and presently dangerous . . . he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons . . . ." *Terry*, 392 U.S. at 30.

During the course of such a protective pat-down, or "stop-and-frisk," if the officer immediately detects nonthreatening contraband on the suspect's person, he may seize it. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). Finally, the police are not limited to temporarily stopping pedestrians encountered on the street, they may also order cars to stop and the occupants to exit. *See*, *e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975). At all events, a temporary stop of the sort authorized under *Terry*, *Hensley* and their progeny is permissible only when the police officer's suspicion of the person stopped is reasonable and articulable, *see*, *e.g.*, *Hensley*, 469 U.S. at 227-29, and has "a particularized and objective basis." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

In the present case, Hesson and his colleagues knew that there were outstanding warrants for Hudson's arrest – one for the aggravated robbery at the One-Stop market, during which Hudson allegedly used a firearm, one for a parole violation, and one for an unrelated felony. Accordingly, the officers, *a fortiori*, had probable cause to arrest Hudson, to assume he was armed and dangerous, and to search his person and wingspan. *See Chimel v. California*, 395 U.S. 752, 762-63 (1969). However, in the year following the robbery at the One Stop, Hesson had been unable to locate Hudson, which is why Hesson seized upon the opportunity presented by the anonymous tip. The issue to be decided is whether the tip, Hesson's attempts to corroborate it, and Hesson's own knowledge of Hudson and Potts, are together sufficient to make out a reasonable suspicion that when the Ford Taurus pulled into the Pantry's parking lot at around 3:00 p.m. on September 14, 2001, one of the passengers was in fact Hudson. *See*, *e.g.*, *Northrop v. Trippett*, 265 F.3d 372, 381 (6th Cir. 2001), *cert. denied*, 535 U.S. 955 (2002) ("Reasonable suspicion is based on the totality of the circumstances . . . ."); *see also United States v. Arvizu*, 534 U.S. 266, 273-74 (2002) (discussing same); *United States v. Orsolini*, 300 F.3d 724, 728 (6th Cir. 2002) (discussing same).

**B.**

Rarely can an anonymous tip by itself constitute a basis for reasonable suspicion, *see Florida v. J.L.*, 529 U.S. 266, 270 (2000), because "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity . . . ." *Alabama v. White*, 496 U.S. 325, 329 (1990). Nevertheless, as the Supreme Court observed in *Florida v. J.L.*, "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" 529 U.S. at 270 (quoting in part *White*, 496 U.S. at 327). Consequently, where a tip "contains independently verifiable details showing knowledge," *Northrop*, 265 F.3d at 381, that are sufficiently corroborated by the police prior to initiating the seizure of the suspect, reasonable suspicion exists. *Id.*; *White*, 496 U.S. at 326-27; *J.L.*, 529 U.S. at 270-71.

In the present case, the scope of the anonymous tip, that is, what the tipster said and what the tipster did not say, is determinative. According to Hesson's account, the tipster asserted that on September 14, 2001, Potts would arrive at work at 3:00 p.m. at the Pantry, accompanied by Hudson, and driving a red or maroon Ford Taurus. *See* J.A. at 52. Hesson independently corroborated at least some of this information: David Hollis, Potts's boss, confirmed that Potts worked at the Pantry and would arrive at around 3 p.m. on the 14th; Hesson testified that Hollis also confirmed the make and model of Potts's car and although Hollis denied this, the district court credited Hesson's representation; and, finally, in addition to his efforts to independently corroborate the tip, Hesson suspected – on the basis of his experience as a police officer in Gallatin – that Potts and Hudson were romantically involved and had a child together.

However, the district court discredited Hesson as to the tipster's most critical assertion – that Hudson would be in the car. While Hesson testified that the tip had included this prediction, Hesson's report, which he composed soon after receipt of the tip, makes no reference to it. *See* J.A. at 27. The district court noted this discrepancy in its order denying the motion to suppress, *id*. at 206, but nevertheless concluded the officers had reasonable suspicion that Hudson was in the car.

In our judgment, the district court's finding that the tip did not link Hudson to the car was proper but its ultimate legal conclusion that the officers nonetheless had reasonable suspicion was erroneous.

On cross examination at the suppression hearing, Hesson admitted that his report did not indicate whether Hudson would be in the car with Potts when she arrived at work.[6] *See* J.A. at 84. In fact, the report suggests that the tip was rather bare-bones. As Hesson described it in the report: "I received information that Scotty Lee Hudson's girlfriend, Jamie Potts, had a job at the Pantry Market located at 601 Hartsville Pike here in Gallatin. She was supposed to be working the evening shift and was driving a Ford Taurus vehicle, maroon in color. I organized a group of investigators and officers to set up surveillance on the Pantry Market in [sic] hopes to locate Hudson." J.A. at 27 (report). In view of Hesson's testimony and the information in the report itself, we find no basis in the record for reading the tip to include any reference to Hudson. Furthermore, the district court's comment on the matter can fairly be interpreted as a credibility determination to the effect that, despite his direct testimony to the contrary, Hesson's representation that the tip linked Hudson to the car was false. *See* J.A. at 206 (Dist. Ct. Op.) ("The Court notes, however, that the report completed by Hesson prior to the surveillance on the Pantry, does not reflect that the Defendant would be present with Potts."). In any event, at no point in the district court's subsequent analysis of the reasonable suspicion issue does the court suggest that the tip was the basis for the officers' suspicion that Hudson was in the car. Instead, the court appeared to hold that Hesson's previous knowledge of Hudson and Potts, even without more, was sufficient to establish reasonable suspicion that Hudson was in Potts's car when she arrived at work on the day in question.[7] We disagree.

At most, Hesson's previous knowledge of Hudson and Potts furnished the officers with reasonable suspicion that the two were a couple and shared a child. It is a significant, and unreasonable, leap to deduce from this that the two were traveling together to the Pantry on September 14, 2001. The leap is not made any less unreasonable by the fact that the two men accompanying Potts were black, as the investigators knew Hudson to be. Of course, had the officers positively, or at least reasonably, identified Hudson as a passenger *before* approaching Potts's car with their guns drawn – for example, by reference to a photograph of Hudson, or a composite drawing – they would have had reasonable suspicion to seize the car and its occupants.[8] But, lacking reasonable suspicion, the officers elected to seize first and identify second.

Contrary to the government's assertions, this is not a case about sufficiently corroborating a tip – the officers appear to have done that – but a case about what information the tip provided in the first place. As this Court has observed, "[w]hether there was reasonable suspicion depends on the actual content of the tip [the police] received, not what [the police] subjectively believed the information to be." *United States v. Payne*, 181 F.3d 781, 789 (6th Cir. 1999). In all cases, whether

---

[6] Q:    I'm talking about before you came to the scene on the 14th of September. Based on the information [the tip] you received from a police officer, where in that report does it say Mr. Hudson would be present?

A:    It doesn't say that, anything like that.

J.A. at 84.

[7] The dissent suggests the tipster's alleged prediction that Hudson would accompany Potts should be considered in reviewing whether the district court properly found reasonable suspicion to exist. But the district court itself did not rely on this alleged prediction in reaching its decision that the officers had reasonable suspicion, instead basing the decision on other factors, J.A. at 217 (Dist. Ct. Op.), factors we find to be insufficient to the task.

[8] Hesson testified that he needed the assistance of Potts and Burford in identifying Hudson because he did not recognize Hudson. J.A. at 60.

officers initiate a seizure pursuant to a tip or pursuant to other leads,"the detaining officers must have a *particularized* and *objective* basis for suspecting the particular person stopped . . . ." *Cortez*, 449 U.S. at 417-18 (emphases added). The record in this case demonstrates that the officers had no more than a hunch that Hudson would be accompanying Potts to work on the day in question and no more than a hunch that one of the passengers in Potts's car was Hudson. Under the Fourth Amendment, it is clear that this is not enough; instead, for an officer's suspicion to merit description as "reasonable" it must be "grounded in specific and articulable facts, that a person [the officer] encounter[s] was involved in or is wanted in connection with a completed felony." *Hensley*, 469 U.S. at 229. A review of *Hensley* and subsequent cases instructs us that the facts relied upon by the officers in this case were not "specific and articulable," *id*.; nor was the basis for the *Terry* stop of Potts's car "particularized and objective." *Cortez, supra*, at 417-18.

### C.

In *Hensley*, the Cincinnati police issued a so-called "wanted flyer" to neighboring police departments. 469 U.S. at 223. The subject of the flyer was Thomas Hensley, whom an informant had identified as the getaway driver in a recent armed robbery. After receiving the flyer, officers in Covington, Kentucky, who were acquainted with Hensley, "periodically looked for him at places in Covington he was known to frequent." *Id*. Ultimately, the officers found Hensley. One officer saw that Hensley was at the wheel of a white Cadillac convertible stopped in the middle of the street. The officer instructed Hensley to move on so as not to block the street. *Id*. at 224. The officer then radioed the dispatcher to determine whether there were outstanding warrants for Hensley's arrest. *Id*. Meanwhile, two other officers, also acquainted with Hensley, proceeded to nearby locations in search of him. One of the two, officer Cope, soon witnessed Hensley's white Cadillac convertible and stopped the vehicle; after searching the car and discovering three handguns, Cope arrested Hensley and his associate. *Id*. at 224. The precise issue to be resolved by the Court in *Hensley* was whether the Covington officers' reliance on Cincinnati's wanted flyer was sufficient, in and of itself, to constitute reasonable suspicion that Hensley was wanted in Cincinnati. *Id*. at 229-32. The Court held that so long as the Cincinnati police had reasonable suspicion to issue the flyer, the Covington police had reasonable suspicion to stop the person identified in the flyer. *Id*. at 232. The government contends that the stop of Potts's car is consistent with *Hensley*. The government apparently argues that because the Gallatin police were attempting to execute an arrest warrant, just as the Covington officers were in *Hensley*, their actions comport with the Fourth Amendment. We reject this contention. *Hensley* does not stand for the proposition that the police may execute a valid arrest warrant by any means simply because the warrant is valid. It is instructive that in *Hensley* the officers knew the suspect, searched for him in places he was known to frequent, and plainly recognized him and his car *before* initiating the seizure. *See Hensley*, 469 U.S. at 223-24. As a consequence of these rational investigative decisions, which culminated in a positive identification, the officers had reasonable suspicion to detain the suspect, to attempt to confirm that he was in fact wanted, and to arrest him if he was.

In cases following *Hensley* where we have sustained temporary seizures of people suspected of past or ongoing criminal activity, we have done so on the strength of identifying facts specifically linked to the suspect as an individual, to the suspect's location, or to the suspect's vehicle. In *United States v. Barnes*, we upheld a *Terry* stop where officers first conducted surveillance at a clubhouse where the suspect and his associates were known to congregate. 910 F.2d 1342, 1344-45 (6th Cir. 1990). When a man and a woman left the clubhouse, some of the officers followed. The car soon pulled into a gas station; the officers, equipped with a mugshot of the suspect, stopped nearby and waited to see whether the man in the car was the suspect. "When the driver alighted, the officers were able to identify him as Floyd Barnes from the mug shots in their possession." *Id*. at 1343. As in *Hensley*, the precise issue in *Barnes* was whether the officers who seized the suspect had reasonable suspicion that he was in fact suspected of a crime even though the basis for their suspicion was information provided by another police department. *See id*. at 1344-45. As the facts

of *Barnes* show, however, there was no question that the officers had reasonable suspicion to conclude that the man who exited the car was in fact the suspect they were pursuing.

In *United States v. Thomas*, we sustained a *Terry* stop of Albert Thomas, whom the police suspected had shot a man in a bar. 11 F.3d 620, 627-28 (6th Cir. 1993), *cert. denied*, 511 U.S. 1043 (1994). The victim, Lawrence Williams, who was incarcerated, provided officers with an "accurate physical description of defendant Thomas" and "a detailed description of Thomas' truck." *Id*. at 623. Furthermore, Williams advised the officers of the parking lot where Thomas usually parked his truck and of a neighborhood in Cleveland where Thomas could usually be found. *Id*. The officers proceeded to the parking lot and observed a truck that matched the description Williams had provided; the officers determined that the truck was registered to "Billy Thomas." *Id*. Later, the officers observed two individuals sitting in the truck in front of the bar where the shooting occurred. After observing Thomas, "who matched the description given by Williams," enter the truck, the officers followed the trio for a short while and finally stopped the truck. *Id*. at 624. In upholding the stop, we stated: "In this case, [the officers] had specific and articulable facts which constituted a reasonable suspicion that defendant Thomas had committed the felonious assault on Lawrence Williams." *Id*. at 628. In particular, "the officers observed the previously described pickup truck in the exact locations specified by Williams . . . [t]hey also observed the temporary tag in the rear window, the matching description of Thomas, and the suspicious actions of defendants when they became aware of the police as well as defendant Thomas' long delay in bringing his vehicle to a stop." *Id*. We concluded: "All of these factors provided [the officers] with grounds for a valid *Terry* stop of the pickup to ascertain Thomas' identity." *Id*.

Finally, in *United States v. Townsend*, we sustained a *Terry* stop of an individual suspected of involvement with methamphetamine manufacturing. 330 F.3d 438, 440-41 (6th Cir. 2003). A Wal-Mart employee who witnessed the suspect purchase a large quantity of items typically used to manufacture methamphetamine informed the police that the suspect was driving a white Chevrolet Blazer with the tag number "ESA 106." *Id*. at 439. The police dispatcher further confirmed that the suspect had previously been involved in the explosion of a methamphetamine lab and that the Blazer had been stopped in relation to the theft of an ingredient used to manufacture methamphetamine. *Id*. A patrol officer received this information by radio and stopped the Blazer soon thereafter. We upheld the stop because the officer's "knowledge of the alleged purchase of methamphetamine precursors, *coupled with his contemporaneous observation of a car closely matching the description of the vehicle linked to that purchase*, in addition to the information regarding [the suspect's] possible previous involvement in the illegal manufacture of methamphetamine, provided him with *specific* and *articulable facts* justifying the brief investigatory stop." *Id*. at 441 (emphases added).

These decisions are consistent with cases in other circuits, which further support our conclusion in this case that the officers' factual basis for suspecting that Hudson was in Potts's car was not sufficiently specific and particularized to justify a *Terry* stop. *See, e.g.*, *United States v. Quarles*, 330 F.3d 650, 652 (4th Cir.), *cert. denied*, 540 U.S. 977 (2003) (upholding a seizure where an anonymous caller provided a precise physical description of a person wanted by the authorities, described the clothes the suspect was wearing, and informed the police of the street where the suspect was walking); *United States v. Green*, 111 F.3d 515, 520 (7th Cir.), *cert. denied*, 522 U.S. 973 (1997) ("That on one occasion a car is parked on the street in front of a house where a fugitive resides is insufficient to create reasonable suspicion that the car's occupants had been or are about to engage in criminal activity."); *United States v. Cooper*, 949 F.2d 737, 740-41, 744 & n.20 (5th Cir. 1991), *cert. denied*, 504 U.S. 975 (1992) (sustaining a *Terry* stop of a fugitive's car where the police had a precise description of the car, including the make and model and that it had a temporary tag, and of the address where it was parked); *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 400-401 (7th Cir.) (Stevens, J.), *cert. denied*, 421 U.S. 1016 (1975) (sustaining a *Terry* stop to check for identification where the officers were searching for a fugitive and stopped an individual after

consulting a "bulletin [which] carried a picture of the wanted man as well as a description of his physical characteristics").

Furthermore, we are mindful that in this case the police were not attempting to solve a recently committed crime, or an ongoing one, but rather to arrest a person suspected of having committed a felony over a year earlier. In *Hensley*, the Supreme Court contrasted the sort of stop at issue here with the classic *Terry* scenario in which the police seek to prevent a soon-to-be committed crime or to catch a presently escaping suspect:

> The factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct. This is because the governmental interests and the nature of the intrusions involved in the two situations may differ. As we noted in *Terry*, one general interest present in the context of ongoing or imminent criminal activity is "that of effective crime prevention and detection." *Terry*, 392 U.S. at 22 [ ]. A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop.

*Hensley*, 469 U.S. at 228-29 (citations omitted).

While it is beyond dispute that police may initiate a *Terry* stop if they "have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony," *id.* at 229, resolution of the question whether reasonable suspicion existed in the first instance must be sensitive to whether the *Terry* stop was made to investigate a crime committed beyond the recent past. *See id.* at 228-29; 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT §§ 9.2, 9.5 (4th Ed. 2004) [hereinafter LAFAVE, SEARCH AND SEIZURE]. In such cases the police can usually be expected to have had the time to develop a more specific description of the suspect and, because the Fourth Amendment requires the police to take investigative measures that are reasonable under the circumstances, courts will hold the police to this expectation in appropriate cases. *See* 4 LAFAVE, SEARCH AND SEIZURE § 9.5. For example, in *United States v. Rias*, the Fifth Circuit explained: "In the instant case, the facts known to the officer at the time he stopped the defendant clearly did not rise to the required level, and in reality were so tenuous as to provide virtually no grounds whatsoever for suspicion. The officer was unsure whether the automobile used in the robberies was black or blue; the only description of the robbers was that they were black males; the last armed robbery of which he had any knowledge had occurred at least two weeks, and possible a month, earlier; it was not unusual for blacks to be seen in the area; it was midday; the suspects made no attempt to flee. In short, the officer simply stopped two black males because they were in a black Chevrolet." 524 F.2d 118, 121 (5th Cir. 1975); *see also Goodson v. City of Corpus Christi*, 202 F.3d 730, 737-38 (5th Cir. 2000) (observing that a description of a suspect that only addresses the suspect's size and race would be "too vague, and fit too many people, to constitute particular, articulable facts on which to base reasonable suspicion").

In sum, reasonable suspicion to stop a person, whether suspected of a past or ongoing crime, must rest on specific facts – available to the officers *before* they initiate contact – tending to show that the person stopped is in fact the person wanted in connection with a criminal investigation.

Here, the Gallatin police officers encountered a car with Potts at the wheel and two black male passengers. Reasonably suspecting only that Potts and Hudson were once romantically involved, and knowing that Hudson is black, the officers elected to stop the car. When viewed in light of the authorities we have examined, these facts are plainly insufficient to justify the *Terry* stop. Despite having a warrant for Hudson's arrest, the officers apparently did not have his mugshot on hand, nor even his physical description (other than that he is black). Indeed, the record shows that the officers made no attempt to reasonably identify one of the passengers as Hudson prior to initiating the *Terry* stop of the car. Moreover, as we discuss *supra*, the tip upon which the government relies did not mention Hudson and consequently offers no support for the government's contention that the officers reasonably suspected that Hudson was in the car. Instead, as officer Hesson's own report states, the officers proceeded to the Pantry Market on September 14, 2001, "in [the] hopes to locate Hudson." J.A. at 27. Whether this constitutes sufficient reason to conduct surveillance under the Gallatin Police Department's policies is not our place to say. We hold only that the officers' bare hope of finding a suspect at a particular location does not constitute a particularized and objective basis for seizing, even temporarily, a vehicle and its occupants at that location.[9] As the Supreme Court observed in *Terry*, temporary investigative stops must rest on more than "inchoate and unparticularized suspicion, [i.e.,] a hunch." *Terry*, 392 U.S. at 27; *see also United States v. Arvizu*, 534 U.S. 266, 274 (2002) (observing that "an officer's reliance on a mere 'hunch' is insufficient to justify a stop") (quoting *Terry*, *supra*, at 27). In our judgment, the facts that Hudson is black and once had a relationship with Potts do not provide a particularized basis for suspecting he was in the car.[10] While these facts suggest the police were searching for a narrower class of people than simply all black men – namely, black men in the company of Jamie Potts – they are nonetheless descriptive of "too many people [ ] to constitute particular, articulable facts on which to base reasonable suspicion." *Goodson*, 202 F.3d at 737-38; 4 LAFAVE, SEARCH AND SEIZURE § 9.5(g) (discussing the particularity of a suspect's description). Accordingly, because the officers' investigative stop of Hudson was not supported by reasonable suspicion, we reverse the district court's denial of the motion to suppress the crack cocaine.

### D.

Finally, we stress a point not raised by either party but nevertheless worthy of mention: our holding that the stop of Potts's car and the subsequent pat-down of Hudson were unreasonable does not call into question the validity of Hudson's arrest for aggravated robbery. Where the police effectuate an arrest in an illegal manner but nonetheless have probable cause to make the arrest, the proper Fourth Amendment remedy is to exclude only that evidence which is a fruit of the illegality. For example, in *New York v. Harris*, the police had probable cause to arrest the defendant but effectuated the arrest at the defendant's home without a warrant. 495 U.S. 14, 15-17 (1990).

---

[9] The dissent appears to suggest we should treat this stop differently than an ordinary *Terry* or *Hensley* stop because the officers had a warrant for Hudson's arrest. The existence of an arrest warrant is of no moment on the question whether a particular person police officers come across is in fact the subject of the warrant. The warrant supplies the officers with probable cause to arrest the person it names and describes, not a license to duck the reasonable suspicion requirement and stop someone they only have a subjective hunch is that person.

[10] The police were of course free to approach Hudson and talk with him so long as they did not do so in a manner that would lead a reasonable person to feel that he was not free to leave. This is what police officers pursuing bank robbery suspects did in, e.g., *United States v. Waldon*, 206 F.3d 597 (6th Cir. 2000) and *United States v. Scheets*, 188 F.3d 829 (7th Cir. 1999). Such consensual encounters, which need not be supported by any suspicion whatever, will often prove fruitful for the police because during these encounters they may develop the reasonable suspicion necessary to support a *Terry* stop of the suspect. *See Waldon*, 206 F.3d at 603-604; *Scheets*, 188 F.3d at 836-38. When the police have neither probable cause nor reasonable suspicion, a consensual encounter of this type is the only permissible investigative option. *See Waldon*, *supra*, at 602 (discussing that arrests supported by probable cause, *Terry* stops supported by reasonable suspicion, and consensual encounters are the "three types of permissible encounters between the police and citizens") (citing *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)).

Because there were no exigent circumstances, the Supreme Court observed, "arresting Harris in his home without an arrest warrant violated the Fourth Amendment." *Id*. at 17 (citing *Payton v. New York*, 445 U.S. 573 (1980)). Accordingly, the Court upheld the suppression of statements the defendant made to the police during his arrest inside his home. *See id*. at 20. Nevertheless, the Court sustained the admission into evidence of statements the defendant made after he was in police custody and had been provided the *Miranda* warnings. *See id*. Moreover, the Court emphasized that although the manner of the defendant's arrest was unconstitutional, his continued custody – supported by probable cause – was not unlawful and he could not claim "immunity from prosecution because his person was the fruit of an illegal arrest." *Id*. at 18 (citing *United States v. Crews*, 445 U.S. 463, 474 (1980)). The defendant in *Harris* voluntarily made a statement in the police station; this statement was admissible because it "was not the fruit of the fact that the arrest was made in the house rather than some place else." *Id*. at 20. The Court defended its decision to suppress only those statements the police elicited during the illegal arrest, saying:

> The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it should have been; the purpose of the rule has thereby been vindicated.

*Harris*, 495 U.S. at 20.

The Supreme Court's decision in *Harris*, of course, is only one in a long line of decisions addressing the proper role and scope of the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Brown v. Illinois*, 422 U.S. 590 (1975); *see also United States v. Ceccolini*, 435 U.S. 268, 276 (1978). These decisions naturally do not require that Hudson be immune from arrest and prosecution for aggravated robbery simply because the police effectuated an otherwise valid arrest on that charge in an illegal manner. But, as the Seventh Circuit's opinion in *United States v. Green*, 111 F.3d 515 (7th Cir.), *cert. denied*, 522 U.S. 973 (1997), capably explains, these decisions *do* require that the evidence the police obtained by virtue of their arresting Hudson in an illegal manner be suppressed. In *Green*, police officers stopped a car without reasonable suspicion. The officers sought information about a fugitive from the car's occupants, two brothers. During the illegal detention, the officers discovered that there was an outstanding arrest warrant for one of the brothers. The Seventh Circuit upheld the admission of evidence obtained during a search of the car incident to this arrest, *see id*. at 520-23; however, it did so only because the evidence was not "'come at by exploitation [of the illegal stop but] instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id*. at 520-21 (quoting *Wong Sun*, 371 U.S. at 488). The court reasoned that the officers' incidental discovery of the outstanding warrant "constituted an intervening circumstance sufficient to dissipate any taint caused by the illegal automobile stop." *Id*. at 521. The court explained why the search incident to the valid arrest was sufficiently purged of the primary taint, i.e., the illegal stop:

> In this case, while the police inappropriately stopped the Greens, *the purpose of the stop was not to seek evidence against the Greens*, but to obtain evidence against Mark Williams [the fugitive]. . . . *Nor did the police exploit the stop in order to search the automobile. Rather the search came only after they learned that Avery was wanted on a warrant and arrested him*. . . . Our conclusion that the evidence is admissible in this case also will not lessen the deterrent effect of the exclusionary rule on unconstitutional automobile stops because the general rule of exclusion is unchanged. It is only in the unusual case where the police, *after* a questionable stop, discover that an occupant is wanted on an arrest warrant that the intervening circumstances exception will apply.

*Id.* at 523 (emphases added).  A more recent pronouncement from the Seventh Circuit reaffirms this analysis.  *See United States v. Johnson*, 383 F.3d 538, 546 (7th Cir. 2004) (holding that because the officers discovered valid warrants only after they illegally stopped the defendant, the search and arrest of the defendant could not be deemed the purpose of the stop).  As these decisions indicate, when the police make an illegal stop for the very purpose of arresting the person stopped, they are thereby exploiting the illegal stop in a manner prohibited by the Fourth Amendment and the evidence obtained in a pat-down of the arrested suspect or in a search incident to the arrest must be suppressed.

We agree with the Seventh Circuit that the admissibility of evidence obtained in an illegal stop depends upon the *purpose* of the stop.  As our discussion in this opinion amply indicates, and as the government readily concedes, the officers' purpose in this case was clear: to arrest Hudson. This they achieved, but only by exploiting a stop unsupported by reasonable suspicion.   In determining the proper remedy, we must heed the Supreme Court's admonition that the exclusion of evidence is required only where it is necessary to vindicate the Fourth Amendment's purposes. In *Harris*, the Court was guided by the warrant requirement, *see Harris*, 495 U.S. at 20; here, we are guided by the requirement that searches and seizures be reasonable.  U.S. CONST. amend. IV. So that the purpose of this requirement may be vindicated, *see Harris*, 495 U.S. at 20, we hold that while Hudson may be arrested and face prosecution for aggravated robbery, the crack cocaine obtained during the illegal stop must be suppressed because it is "the fruit of the fact that the arrest was made [pursuant to an illegal stop] rather than [a legal one]."  *Id.*

### II.

Next we must determine whether the district court erred in denying Hudson's motion to suppress the gun discovered in the search of 211 East Eastland.  The district court held that under the facts available to the officers at the time, Potts had apparent authority to consent to the search. We agree.

A warrantless search is "*per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347, 357 (1967).  The exception at issue in this case is consent.  "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search."  *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). When, as here, the consenting party is not the defendant but a third party, the consent is valid if "the facts available to the officer at the moment . . . [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises."[11]  *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (internal quotation marks omitted)).  Furthermore, consent in all cases must be voluntary.  *See Schneckloth*, 412 U.S. at 220. We consider each requirement in turn.

### A.

According to Hesson's representation of the facts – which the district court credited as true – Potts told Hesson that she lived with Hudson at a house on East Eastland and that the officers could follow her to the house, where she would open the door and permit them to conduct a search. Hesson further testified that when they arrived at the residence, Potts provided both oral consent to the search and signed a consent form that he reviewed with her.  In addition, although Hudson makes

---

[11] Alternatively, consent is valid where the consenting party in fact has actual authority over the premises.  *See United States v. Matlock*, 415 U.S. 164, 170 (1974).  Here the government does not assert that Potts had actual authority over the East Eastland residence but instead asserts that "the officers reasonably believed Potts had the authority to consent to the search . . . ."  Brief of Appellee at 17.

much of the fact that Potts did not have a key to the residence, the record suggests the officers could have reasonably believed that the key she used to open the door was her own.[12] In any event, the district court credited Hesson's testimony on the factual disputes surrounding the issue of consent and found that the key was Potts's. *See* J.A. at 218-19 (discussing the fact that Potts had a key to the residence); *see also id.* at 93-94, 101-102 (testimony of Hesson) (stating that he had no recollection of Potts using Hudson's keys to enter the house).

In the absence of a clear basis in the record for rejecting the district court's credibility determinations, we are bound by those determinations. This Court has repeatedly observed that "[f]indings of fact anchored in credibility assessments are generally not subject to reversal upon appellate review." *United States v. Taylor*, 956 F.2d 572, 576 (6th Cir. 1992) (*en banc*); *see also United States v. Carter*, 378 F.3d 584, 589 (6th Cir. 2004) (*en banc*); *United States v. Davis*, 306 F.3d 398, 423 (6th Cir. 2002). Hudson does not point to a clear error committed by the district court in crediting Hesson as opposed to Potts; and we do not see such an error in the record before us. Consequently, we must assess whether the facts, as represented by Hesson, and as they were at the moment the officers sought Potts's consent, would "warrant a man of reasonable caution in the belief that [Potts] had authority over the [residence at 211 East Eastland]." *Rodriguez*, 497 U.S. at 188; *see also Jenkins*, 92 F.3d at 436.

Our review of the record discloses only one fact weighing in favor of Hudson's argument that Potts lacked apparent authority to consent; namely, that Hesson knew Potts's name was not on the lease for the East Eastland residence. On cross examination, Hesson testified that he was aware that Hudson's grandmother rented the house because Potts had told him this. *See* J.A. at 100-101. However, Hesson further testified that Potts explained that she and Hudson and their child lived at the residence. *Id.* at 100. Moreover, according to Hesson, Potts never said she lacked authority to consent to the search but instead consistently maintained that she lived at the house. *Id.* The question to consider, therefore, is whether Hesson's knowledge that Potts was not a lessee of the residence undercuts the remaining facts, the totality of which support the district court's holding that Potts had apparent authority to consent. An appropriate starting point for analyzing this question is *Illinois v. Rodriguez*, 497 U.S. 177 (1990), the case that established the concept of apparent authority. In crafting this rule of law, the Supreme Court lent critical weight to whether the police could reasonably conclude that the party consenting to the search *lived* at the premises. *See Rodriguez*, 497 U.S. at 183-84 (observing that a cotenant's consent makes a search reasonable under the Fourth Amendment); *id.* at 186 (discussing that it is reasonable to search premises where officers reasonably "believe that the person who has consented to their entry is a resident of the premises"); *id.* at 188 (suggesting that the critical determination officers must make is whether, in light of all the circumstances, the consenting party lives at the premises). The Court declined to rule on the merits of the case, but subsequent cases interpreting *Rodriguez* and the apparent authority doctrine it created suggest that no one fact, such as who appears on the lease of a premises, is determinative. For example, in *United States v. Gillis*, we held that the defendant's girlfriend had apparent authority to consent to a search of the defendant's apartment even though the officers were aware that she used another residence and did not have keys to the defendant's apartment. *See* 358 F.3d at 388, 391. We found apparent authority to exist largely on the basis of the girlfriend's statements that she lived at the defendant's apartment and was able to provide specific information about spots therein where the defendant hid drugs. *Id.* at 391. To recapitulate the circumstances of the present case, and crediting the officers' representation of the facts, the officers reasonably believed the following: Potts and Hudson were romantically involved and had a child; Potts, Hudson, and the child lived

---

[12] According to Potts's testimony, after the officers detained Hudson and placed him in a police car, she asked Hesson for permission to retrieve the keys and cell phone that at some point had been placed on the roof of the car. J.A. at 143. Hesson testified that he had no recollection of discussing the keys with Potts, *see id.* at 93-94, 101-102, but even if he had discussed the ownership of the keys with Potts, there is no indication that she told him they were Hudson's keys, as opposed to hers.

with Hudson's grandmother at the home at 211 East Eastland; and Potts had a key to the home. We hold that these circumstances, considered in their totality, would lead a reasonable police officer to conclude that Potts had authority to consent to the search of the residence.

**B.**

The district court did not specifically determine whether Potts's consent was voluntary. *See* J.A. at 218-19. However, the court's decision to credit Hesson's testimony regarding the events that led up to Potts's consent largely decides the matter. First, it is undisputed that Potts was no longer seized once Hudson was arrested; Potts testified that she was free to leave. *See* J.A. at 143. Second, accepting Hesson's representation as true, Potts next orally consented to a search of the residence and offered to lead the officers there. Third, Hesson presented the consent form to Potts and reviewed it with her, explaining what it was. Finally, Potts signed the form and unlocked the door to the residence. *See* J.A. at 62-66. The district court discredited Potts's testimony that she was coerced and/or tricked into signing the form – which she testified was represented to her as a warrant – on the grounds that she had voluntarily signed the same consent form prior to the officers' search of her car and later testified that she usually signs forms only after reading them or receiving an explanation as to their contents. *See* J.A. at 219. Similarly, the district court elected to credit Hesson's denial of Potts's allegation that he threatened her with prosecution for conspiracy and harboring a fugitive. Finally, we note that the consent forms provided to Potts clearly indicate her rights to demand a warrant and to refuse the officers' requests to search.[13]

With these facts in mind, we must consider the totality of the circumstances in determining whether Potts voluntarily consented to the search. *See Shneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "Consent must be . . . unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion." *United States v. Butler*, 223 F.3d 368, 375 (6th Cir. 2000) (quoting *United States v. Williams*, 754 F.2d 672, 674-75 (6th Cir. 1985)); *see also United States v. Ivy*, 165 F.3d 397, 401 (6th Cir. 1998). Having viewed the facts in the light most favorable to the government, *see United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998), having committed credibility determinations to the discretion of the district court, *see, e.g.*, *Davis*, 306 F.3d at 423, and having considered the totality of the circumstances as described *supra*, we are satisfied that Potts consented voluntarily.

Accordingly, we must affirm the judgment of the district court insofar as the court denied Hudson's motion to suppress the gun discovered during the search of 211 East Eastland.

---

[13] Both consent forms signed by Potts, for the search of the car and for the search of the home, provide, in relevant part:

> I, JAIME POTTS, have been informed by EDWARD HESSON and LAMAR BALLARD, GAIL HUMES who made proper identification as authorized law enforcement officers of the GALLATIN POLICE DEPARTMENT of my CONSTITUTIONAL RIGHT not to have a search made of the premises and property owned by me and/or under my care, custody and control, without a search warrant.
>
> Knowing of my lawful right to refuse consent to such a search, I willingly give my permission to the above named officers to conduct a complete search of the premises and property . . . .

(Attachment to motion to take judicial notice; granted January 6, 2005).

**III.**

Finally, we address Hudson's contention that he his entitled to re-sentencing under the Supreme Court's recent decision in *United States v. Booker*, 543 U.S. —, 125 S. Ct. 738 (2005). We review only for plain error because Hudson first raised this claim on appeal. *See, e.g.*, *United States v. Oliver*, 397 F.3d 369, 377-78 (6th Cir. 2005); *United States v. Milan*, 398 F.3d 445, 450-51 (6th Cir. 2005). Furthermore, because we held *supra* in Part I of this opinion that the crack cocaine should have been suppressed, we address only Hudson's 53-month sentence for possessing a firearm as a convicted felon.[14]

Initially, we observe that Hudson's sentence does not conflict with the Sixth Amendment as interpreted by the Supreme Court in the line of cases that culminated with *Booker*.[15] *See Blakely v. Washington*, 542 U.S. —, 124 S. Ct. 2531 (2004); *Ring v. Arizona*, 536 U.S. 584 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Hudson concedes this, but maintains that he is nevertheless entitled to re-sentencing because it was plain error for the district court to sentence him under the impression that the Federal Sentencing Guidelines were mandatory. We recently spoke to such a claim in *United States v. Barnett*, 398 F.3d 516 (6th Cir. 2005), *reh'g en banc denied*, 400 F.3d 481 (Mar. 9, 2005), where we held that in light of the Supreme Court's remedial holding in *Booker*, a sentencing court's failure "to treat the Sentencing Guidelines as advisory" constitutes plain error. *Id.* at 527. Under *Barnett*, we are to presume that such an error affected a defendant's substantial rights. *See id.* at 527-29. As the Court in *Barnett* was careful to observe, however, "[t]his is not to discount the possibility . . . that in other cases the evidence in the record will be sufficient to rebut the presumption of prejudice." *Id.* at 529. Thus, we are to determine whether "the trial record contains clear and specific evidence that the district court would not have, in any event, sentenced the defendant to a lower sentence under an advisory Guidelines range." *Id.* (citing *United States v. Crosby*, 397 F.3d 103, 118 (2d Cir. 2005)).

Upon careful review of the record before us, we cannot conclude that the district court would not have sentenced Hudson to a lower sentence had it known the guidelines were merely advisory. Hudson pled guilty to being a felon in possession of a firearm; because one of his prior felony convictions was for aggravated robbery, his base offense level was 20. *See* U.S.S.G. § 2K1.2(a)(1)(4). The district court reduced the offense level by 3 points for acceptance of responsibility. *See* U.S.S.G. §§ 3E1.1(a) and (b). With an offense level of 17 and a criminal history category of V, Hudson's sentencing range was 46 to 57 months' imprisonment. Even though Hudson has 12 criminal history points, the maximum in the category, the court imposed a sentence of 53 months – a term slightly above the midpoint of the range. Under *Barnett*, a "middle-of-the-range sentence imposed under the mandatory Guidelines regime" is not sufficient in and of itself to rebut the presumption that Hudson was prejudiced. *See Barnett*, 398 F.3d at 529. In this case, the district judge weighed various considerations before settling on a final sentencing determination. The judge voiced concern at the sentencing hearing that Hudson's criminal history might have as much to do with Hudson's tragic personal history, psychological instabilities, and drug addiction as with malicious criminal intent. As careful as the judge's deliberations were, these reflections, offered at a time when the Guidelines were considered mandatory, do not constitute "clear and specific evidence" that the judge would today, post-*Booker*, sentence Hudson to no less than 53

---

[14] The district court sentenced Hudson to a 1 year prison term on the cocaine possession charge. Since we vacate his conviction on this charge, we need not address Hudson's challenge to this sentence.

[15] Hudson pled guilty to being a convicted felon in possession in a firearm. *See* 18 U.S.C. § 922(g). Because of his 1997 aggravated robbery conviction, he qualified as having committed the felon-in-possession offense "subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(4)(A). Accordingly, the base offense level for Hudson's offense is 20. The district court did not apply any upward adjustments.

months.  Accordingly, we hold that Hudson was prejudiced, i.e., that his substantial rights were affected.

Finally, as this Court did in *Barnett*, "[w]e conclude that an exercise of our discretion [to remedy the plain error] is appropriate in the present case."  *Barnett*, 398 F.3d at 530.  As our Court has observed in the wake of *Booker*, the court of appeals ought not assume that a defendant's sentence under the new discretionary sentencing regime would be the same and therefore that a remand is superfluous.  *See Oliver*, 397 F.3d at 381 n.3 ("We would be usurping the discretionary power granted to the district courts by *Booker* if we were to assume that the district court would have given [the defendant] the same sentence post-*Booker*."); *Milan*, 398 F.3d at 451-52 ("We decline to hypothesize alternative sentences the district court might have imposed had it anticipated *Booker*.").  Consistent with these principles, we vacate Hudson's sentence and remand for re-sentencing, "thus affording the district court the opportunity to re-sentence him in the first instance."  *Barnett*, 398 F.3d at 530.

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's denial of Hudson's motion to suppress as to the crack cocaine but AFFIRM the denial of the motion to suppress as to the gun.  In addition, we VACATE Hudson's sentence and REMAND for re-sentencing.  Accordingly, this case is remanded for proceedings consistent with this opinion.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

SILER, Circuit Judge, concurring in part and dissenting in part. I concur with Part II of the majority opinion, in which it upheld the search of the residence and the seizure of the firearm therein. I also concur with Part III, remanding for resentencing in light of *United States v. Booker*, 125. S. Ct. 738 (2005). Moreover, although Part I D may rightly state the facts and the law, I do not adopt it. It discusses an issue not raised by the parties and not discussed in the briefs. There is no reason to decide a matter which the parties do not feel is material and which is not necessary to a resolution of this case. Finally, I dissent from the remainder of Part I of the majority opinion, in which it reversed the district court's denial of the motion to suppress the crack cocaine found on Hudson.

The district court found there was reasonable suspicion for the police to briefly detain Hudson after approaching the vehicle in which he was sitting, under the authority of *United States v. Hensley*, 469 U.S. 221, 229 (1985); and *Terry v. Ohio*, 392 U.S. 1 (1968). Several relevant facts should be noted. First, the officers did not stop the vehicle in which Hudson was riding. The vehicle came to a stop at the store before the officers approached the vehicle and asked the occupants to get out. Therefore, the intrusion here was slightly less than what occurred in *Hensley*, where the officers stopped the vehicle which the suspect was driving. Second, there was an outstanding arrest warrant which had been issued for Hudson for an armed robbery about eleven months before in the same community, Gallatin, Tennessee, which is a small town, and Officer Hesson knew about it. In *Hensley*, there was a "wanted flier" from another community in the vicinity, but apparently there was no warrant.

Moreover, Officer Hesson knew that Jamie Potts worked at the Pantry Market in Gallatin, that she would likely arrive when her shift began about 3:00 P.M., that she would be driving a red or maroon Ford Taurus, and that she shared a child with Hudson. The officer also knew that Potts was a white woman and Hudson was a black man, although Hesson was not able to identify Hudson by sight.

The only other information known by Hesson which is of concern to the majority is that Hesson said that he learned from the informant that Potts would be arriving in her car and accompanied by Hudson. The majority finds that because Hesson did not mention in his written report that Hudson would be in the car with Potts when she arrived, an inference is raised that the district court found that Hesson was not credible when he testified that he was informed that Hudson would be with Potts at the time Potts arrived. However, I do not think that is a reasonable inference from the record. The district court merely stated that Hesson's written report did not reflect that Hudson would be with Potts, but Hesson testified under oath that he received such information. Nothing in the record refutes it. The court did not find that statement to be incredible because it was not included in the written report. Instead, it found that the officers had reasonable suspicion to justify the limited detention of Hudson in order to determine if one of the two males in the vehicle was Hudson. Most of the information Officer Hesson had in his mind was corroborated, except he did not know whether one of the two men in the vehicle was Hudson. The district court correctly found that the officers had reasonable suspicion to detain Hudson long enough to determine his identity. *See Alabama v. White*, 496 U.S. 325, 330-31 (1990).

In sum, I would **AFFIRM** the convictions in the district court but would **REMAND** for resentencing under *Booker*.