(332 P.3d 199)

No. 110,250

STATE OF KANSAS, *Appellant*, v. LANCELOT JOSHUA WILBURN, *Appellee*.

Opinion filed August 15, 2014.

*Vanessa M. Riebli*, assistant district attorney, *Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Catherine A. Zigtema*, of Law Office of Kate Zigtema, LC, of Lenexa, for appellee.

Before MALONE, C.J., ARNOLD-BURGER, J., and BUKATY, S.J.

ARNOLD-BURGER, J.: In February 2012, Lancelot Joshua Wilburn and a companion were stopped by two Overland Park detectives at Oak Park Mall. Suspecting criminal activity, the detectives detained the two men and confiscated their cell phones. A bizarre sequence of events unfolded from this detention, resulting in an intercepted phone call, four arrests, the search of a fraudulently rented Kia, and the discovery of a large amount of evidence tying Wilburn to a fraud ring. But because the detectives lacked reasonable suspicion to stop and detain Wilburn, the district court suppressed all evidence stemming from his detention, including the statements made by his companion, and the evidence seized from the Kia.

The State appeals this ruling on three bases: (1) Wilburn lacked standing to challenge his companion's statements; (2) Wilburn lacked standing to challenge the search of the Kia; and (3) discovery of the Kia and its contents was inevitable. After a review of the evidence and the law we find: (1) Wilburn had standing to challenge his companion's statements; (2) even though Wilburn had no standing to challenge the search of the Kia, its contents were still properly excluded as fruit of the poisonous tree; and (3) the discovery of the Kia and its contents was not inevitable. Accordingly, we affirm the decision of the district court suppressing the companion's statements and the items found in the Kia.

## FACTUAL AND PROCEDURAL HISTORY

To quote the district court, the facts of this case are "a pit full of snakes that are swirling around with one another" combined with "a law school final in criminal procedure." We will do our best to summarize the events of February 2012.

Detective Byron Pierce from the Overland Park Police Department was dispatched to Oak Park Mall in Overland Park. Pierce, who specializes as a fraud and financial crimes investigator, arrived with Detective Lance Jordan to investigate fraud at Barnes & Noble. Specifically, dispatch said that an African-American woman was committing check fraud at the store and had been detained. As Pierce exited his vehicle, he noticed two African-American men

in the parking lot, walking away from Barnes & Noble and staring at him. The men were dressed appropriately and did not appear threatening or to be carrying contraband. However, one of the men appeared to fixate on Pierce, giving him what he termed " 'the look.' " Pierce explained this look at the preliminary hearing:

> "Say, for instance, you have a puppy at home and you put the puppy in a kennel and you go off to work. Somehow that puppy is able to defeat that lock on the door and the puppy is running loose all day long. You walk in the door, greeted by the puppy, and the first thing that comes to mind is, What are you doing out? And the puppy is looking at you, What are you doing home? You're both looking at each other like, well, I've been up to no good and, as the pet owner, I'm saying, What have you been into? It's 'the look.' "

Because of this look and his experience investigating fraud and financial crimes, Pierce suspected that one or both of the men may have been secondarily involved with the check fraud at Barnes & Noble. When Pierce turned around toward the men, they began to separate and walk quickly away; Pierce alerted Jordan, and they pursued the men. The detectives stopped the men—later identified as Wilburn and Raymond Curtis—either just inside or just outside the nearby Dillard's store and handcuffed them.

Detectives then questioned Wilburn and Curtis, learning—albeit through some evasiveness—that they originated from California and that they arrived in a vehicle. Pierce felt that the men's stories conflicted in a suspicious manner. As such, Pierce detained Wilburn and Curtis and placed them in a police car. Importantly, he also confiscated their cell phones. After attempting to question both men further, Pierce left to interview the woman detained at Barnes & Noble, who ultimately had no connection to either Wilburn or Curtis.

While Pierce was in Barnes & Noble, one of the seized cell phones began to ring, ringing "almost continually" during his interview with the check fraud suspect. Pierce answered the phone after the interview, and a female said, " 'Hey, I'm over at Chick-fil-A, come get me.' " Because Wilburn originally said he and Curtis were alone at the mall, Pierce and Jordan found the call suspicious and proceeded to investigate. At the restaurant, they encountered two women—Tori Condoll and Markima Carroll—

with a number of shopping bags. When asked about any potential connection to Wilburn, Condoll told Pierce that Wilburn was her boyfriend. The women consented to a search of their bags, and the detectives found receipts indicating that a third woman, Kathryn Green, had bought the items. The women stated that an aunt purchased the items but could not explain who Green was, leading the detectives to suspect the items were the fruits of identity theft.

In part due to a conversation with Nordstrom's loss prevention team and in part due to his interview with Condoll, Pierce determined that at least Condoll and Carroll—and possibly all four suspects (Condoll, Carroll, Wilburn, and Curtis)—had arrived at the mall in a sport utility vehicle (SUV). When a search determined that none of the suspects had keys on their person, Pierce announced to the other officers working the case that they needed to look for keys to such a vehicle. Another officer then remembered a passerby outside of Barnes & Noble handing him a set of dropped keys, which he had turned into mall security. Pierce asked mall security to search the parking lot for the car matching the keys; the vehicle in question ended up being a blue Kia SUV with California license plates parked just north of Barnes & Noble. Nordstrom and Target bags were visible in the car, as was clothing. Running the tags revealed that the Kia had been rented in California by a woman named Kathryn Green.

Ultimately, Pierce obtained a search warrant for the Kia, inside of which he and other officers recovered Nordstrom and Target purchases thought to be the fruits of criminal activity, as well as "instruments of fraud and forgery, counterfeit American Express Traveler's Cheques," and counterfeit credit cards naming Kathryn Green as the cardholder. Later, Condoll informed law enforcement that she was working for Wilburn using fraudulent credit cards and traveler's checks. Moreover, a third party later contacted Pierce and provided him with counterfeit driver's licenses, including one that purported to be Kathryn Green but had Condoll's picture on it.

In connection with the foregoing series of events, the State charged Wilburn with 20 offenses, including multiple counts of theft, forgery, identity theft, and a single count of criminal use of

a financial card. Wilburn subsequently moved to suppress all evidence obtained subsequent to Pierce stopping him and Curtis outside Dillard's. Wilburn argued that Pierce lacked reasonable suspicion to stop him and that, even if reasonable suspicion did exist, Pierce exceeded the scope of his investigatory stop by detaining him. Moreover, Wilburn contended that detectives lacked probable cause to arrest him. Because every seizure from the initial stop to the arrest was an illegal one, Wilburn argued that all evidence obtained from that stop needed to be suppressed as fruit of that initial illegality. The State argued that reasonable suspicion existed to stop Wilburn and that Pierce never exceeded the scope of the investigatory stop. Additionally, the State contended that both inevitable discovery and the attenuation doctrine applied, rendering the evidence admissible.

The district court heard the motion to suppress in multiple stages. The first portion of the motion was heard by Judge John Bennett over at least two dates. For the most part, the facts developed at this hearing are not relevant to this appeal. However, Jordan testified about the amount of credit card and check fraud that occurs at Oak Park Mall, the structure of the groups that commit these types of fraud, and the events that occurred when he and Pierce encountered Wilburn and Curtis outside Barnes & Noble. Importantly, Jordan indicated that, while he and Pierce were at Chick-fil-A with Condoll and Carroll, Pierce spoke to another detective on the phone. That detective reported that earlier in the day, he had spoken to Nordstrom personnel about a group of individuals who were perpetrating credit card fraud at the mall. That detective also informed Pierce that the group in question originated from California, furthering the connection between Wilburn, Curtis, and the fraudulent transactions. Moreover, one of the females appeared on a surveillance video recovered from Nordstrom, which led to the arrest of all four suspects.

Other testimony developed during the hearing before Judge Bennett included the evidentiary foundation of certain information downloaded from cell phones in the case, Pierce's explanation for why he needed the cell phone data downloaded, and some con-

fusion over the timeline between when Pierce answered the phone call from Condoll and when he arrived at Chick-fil-A.

The district court's comments at the close of argument suggest that the pertinent issues at the this stage of the hearing concerned whether the initial stop was legal, whether Pierce answered Wilburn's phone (rather than Curtis'), and whether the State could prove that the evidence from the Kia was discovered through means independent from the phone call. After argument, the district court ruled that the detectives lacked reasonable suspicion to stop Wilburn and Curtis in Dillard's. The court also found that the State was unable to establish that Pierce had answered Curtis' phone and not Wilburn's phone. Because Pierce lacked reasonable suspicion to stop Wilburn, answering Wilburn's phone was also impermissible, requiring the suppression of all evidence obtained as a result of that phone call as fruit of the poisonous tree. As for the question of the independent basis to tie Wilburn to Condoll, Carroll, and the Kia, the district court reserved dismissing the case to allow the State to review evidence and attempt to prove that such an independent basis existed. At that time, the State requested a 1-week continuance to "evaluate whether or not we are going to interlock the motion to suppress," as well as to gather information for the remaining issues.

The State ultimately elected against an appeal of the March 2013 ruling, and in April and June 2013, Judge Sara Welch heard the second stage of the motion to suppress. This hearing addressed *only* the applicability of the doctrines of inevitable discovery and independent source, Wilburn's standing to challenge the search of the Kia, and Wilburn's standing to challenge the use of Curtis' statements. Nothing in this hearing disrupted Judge Bennett's ruling; rather, it served to address the outstanding issues raised by the parties.

Regarding standing, Wilburn and the State essentially agreed to ask that the district court take judicial notice of the transcript from the preliminary hearing when considering whether Wilburn had a possessory interest in the Kia sufficient to allow him to challenge the search. The parties agreed that the basic facts included that the Kia was rented by Condoll and Carroll with fraudulent iden-

tification and credit cards and that Wilburn orchestrated the rental. The legal argument focused on whether the fraudulent rental rendered the Kia stolen. After some discussion, the district court agreed to take judicial notice of the transcript and reserve ruling on the standing issue. The State then proceeded to present evidence regarding inevitable discovery and independent source. A brief overview of this evidence is as follows.

The loss prevention manager from Nordstrom, Elizabeth Rynerson, testified that on that day she was alerted to two women who were attempting to purchase items with a faulty credit card and identification from California that appeared to have been altered. The identity being used was Kathryn Green. Rynerson testified that Nordstrom personnel linked one of the women to a dark-colored SUV and that two individuals were sitting in the car. Rynerson contacted Detective Justin Russell, who "specializes in financial identity theft crimes," about the suspicious transactions.

Officer Jason Goddard of the Overland Park Police Department testified that, after he arrived to assist with the Barnes & Noble call and while Wilburn and Curtis were detained, a passerby approached him with a set of car keys for a Kia that the passerby found in the parking lot. Goddard handed the keys off to a passing mall security officer. Goddard testified that he later informed Pierce about the keys in question.

Eugene Carnales, director of security at the mall, testified that when a lost item such as a set of keys is found at the mall, it is held by mall security until an individual comes in, describes the item, and provides identification. This entire process is reported and recorded. Carnales also explained that if a vehicle remains in the parking lot for approximately 5 days, security will consider it abandoned and contact the police to ensure the vehicle is not stolen or otherwise accounted for before towing. Carnales did add on cross-examination that, if an abandoned car is blocking traffic or was used in a crime, he will have it towed before the 5-day period expires.

A risk manager from Enterprise Leasing (Enterprise), Christopher Buck, testified that whenever a car owned by Enterprise is towed by the company the mall employs, that company will contact Enterprise to retrieve it. Enterprise will then inspect the vehicle

at their facility, looking for damage and also any property that may be left behind. Buck explained that any suspicious or fraudulent material is reported to the authorities. When shown photographs of the evidence recovered from the Kia, Buck confirmed that Enterprise would have contacted the police about those items. Buck also testified that the Kia in this case was rented from Enterprise in Los Angeles, California, but that the transaction turned out to be a fraudulent one. However, Buck acknowledged that Enterprise only learned about the fraud in April 2012, after the Kia had been returned to Enterprise by law enforcement.

Russell testified about the call from Rynerson, explaining that he did not intend to respond to Nordstrom that day because the suspects had left the store and because he wanted Rynerson to gather information such as video surveillance and the credit card transaction information prior to investigating. But that same afternoon, Russell and Pierce spoke on the phone about whether Russell "could have [Pierce's] off-duty that evening because" Pierce was dealing with "a couple of people in custody that were from California." Because Rynerson had told Russell that the women at Nordstrom originated from California, Russell told Pierce about the Nordstrom call. Russell testified that, but for the conversation with Pierce, he would not have followed up on the Nordstrom call until "[p]robably the next day." He explained that part of the investigation would have been looking for the vehicle Rynerson described during the next evening, when the mall was closed.

Pierce testified about his experience investigating retail fraud perpetrated by organized groups at Oak Park Mall, many of whom originate from New York or Los Angeles. Pierce then recounted his initial encounter with Wilburn and Curtis, Curtis' behavior and demeanor, and his reasons for asking about what vehicle the men arrived in. Pierce revealed that he called Russell because it was after 5 p.m. and Pierce—still "tied up" on the case—needed someone to cover an off-duty obligation at 6 p.m. Learning about the Nordstrom call from Russell led Pierce to suspect Curtis was connected to the fraud at Nordstrom. Pierce also recounted his own conversations with Rynerson regarding the fraud and the "dark-colored SUV."

In regard to the keys that Goddard found, Pierce testified that after searching all four suspects (who at that point had been arrested) and finding no keys, he generally informed all the officers involved in the investigation about the missing keys. After Goddard informed Pierce about the keys found by the passerby, Pierce requested that mall security "get the key fob, hit the alarm, and find that vehicle" associated with those keys. Security located the Kia—which matched Rynerson's description—10 to 15 yards away from where the keys were found, loaded with Nordstrom bags. The car was towed and searched pursuant to a warrant by Pierce and a member of the United States Secret Service (Secret Service) who was partnered with the police department.

Pierce also testified about the evidence found in the Kia, including the traveler's checks and credit cards. Pierce further explained that Curtis was released the day after the February 2012 events because the police lacked evidence to hold him as part of the fraud ring. However, Pierce testified even after a suspect is released, his department and the Secret Service continue to investigate and follow up with that individual.

On cross-examination, Pierce revealed that by the time Russell called and Pierce went to Nordstrom, Wilburn had been detained and "effectively under arrest" for "at least a couple hours." Pierce acknowledged that, because Wilburn was detained, he was unable to leave the mall with or without the Kia.

Steve Hatch, a Secret Service agent who participates in financial crime investigation out of the Kansas City Secret Service office, testified about how his agency tracks and investigates financial crimes in various jurisdictions across the country. Hatch, who helped search the Kia, testified that they found a ticket issued to Wilburn by Kansas Highway Patrol in the glove box. He also testified about how he determined Green was a victim of identity theft and not the true renter of the Kia. He explained that some of Carroll's actual belongings, including her driver's license, were also recovered from the Kia. Hatch further testified that Wilburn's name came up during the search, and that, upon investigating Wilburn's history with the Secret Service, he uncovered other cases involving Wilburn. Hatch contacted other agents within the Secret

Service to learn more about Wilburn's past cases, and he verified that he would have continued investigating the case in relation to events in other jurisdictions based on the contents of the car alone. Hatch also testified about how the evidence in the Kia led him to other stores in the Overland Park area where Green's identity was fraudulently used.

On cross-examination, Hatch explained that the search warrant was executed the day after the initial events at Oak Park Mall and that the information he recovered from the other stores was discovered "outside of five days" from Wilburn's arrest.

Agent Matthew Mitchell, also from the Secret Service, testified about his involvement with Wilburn through an earlier fraud case out of Utah and his contact with Hatch regarding the events at Oak Park Mall. Mitchell discussed what steps he would have taken to further develop the Secret Service's case against Wilburn and the others involved in the fraud ring. Mitchell testified how the items found in the Kia would have led him to Carroll and allowed him to link the Oak Park fraud to both the original theft of Green's identity and other crimes.

After the close of evidence, the district court and parties discussed setting over the argument portion of the hearing to a later date. During this discussion, confusion arose as to whether Curtis' statements during the initial detention had been suppressed by Judge Bennett's March ruling. The State contended that Curtis' statements could not be suppressed by the March ruling because Wilburn lacked standing to challenge the admission of the statements. With Curtis' statements about arriving from California in a vehicle and the Kia's keys being lost—thus rendering the Kia immobile—the State argued that it was only a matter of time before the Kia was discovered, towed, inventoried, and subject to law enforcement investigation. With Secret Service involvement, the State reasoned that Wilburn's role in the fraud would inevitably have been discovered. Wilburn rejected this assertion and argued that all the evidence obtained by Pierce and other officers—from answering the cell phone to the search of the Kia—originated from the unlawful stop; and that the State's inevitable discovery and independent source arguments were predicated on the Kia being

towed after remaining in the Oak Park parking lot for 5 days. Moreover, Wilburn contended that, but for his unlawful detention, he could have recovered the keys and removed the Kia from the parking lot, thus preventing a future towing.

In terms of standing, the State argued that because the Kia was rented with a false identity using stolen credit cards, it was stolen and Wilburn lacked any interest or expectation of privacy sufficient to allow him to challenge its search. Wilburn contended that although the Kia was not lawfully rented, it was not actually stolen. The district court reserved its ruling pending further briefing and argument by the parties.

The district court concluded the hearing and issued its ruling in June 2013. Regarding Wilburn's standing to challenge the search of the Kia, the district court determined that the Kia was rented with fraudulent documents. Moreover, the district court accepted the presumption in K.S.A. 2013 Supp. 21-5804(a)(1) (giving of a false identification or a fictitious name is prima facie evidence of intent to permanently deprive the owner of the property) and found "that the Kia was stolen at the time it was discovered by Overland Park [detectives]." Because the Kia was stolen and because Wilburn never "claimed either a proprietary or possessory interest" in it, he lacked standing to challenge the search. However, the district court determined it could not end its inquiry with the question of standing.

The district court returned to Curtis' statements to law enforcement—statements "which arguably forged a link in the chain which led from the defendants to the dark-colored Kia"—and determined that they were "as much a fruit of the poisonous tree as would have been a bag of marijuana seized from his pocket during the course of th[e] unlawful detention." Because Wilburn and Curtis "were stopped at the same time in the same place by the same officer for the same reason," Wilburn had standing to challenge the admission of Curtis' statements and no attenuating circumstances lifted the taint of the unlawful detention.

Without Curtis' statements, the district court ruled that the "chain of events from the lost keys to the discovery of the car and its contents [was] not inevitable." Similarly, the district court ruled

that but for the arrest of the four suspects, it was unlikely that Pierce and Russell would have tied the fraud at Nordstrom to Wilburn, Curtis, and the lost keys. In short, "Curtis's statements are outcome determinative of the inevitable discovery argument made by the State," and the State "failed to prove . . . that the vehicle or the identities of the female suspects would have been inevitably or ultimately discovered." The district court also rejected the State's independent source argument. These rulings were memorialized in a journal entry.

The State timely appealed but limited its appeal to "Judge Sara Welch's order entered on June 26th, 2013 suppressing evidence."

## ANALYSIS

### Our standard of review

The State appeals from the suppression of evidence, which it is statutorily permitted to do. K.S.A. 2013 Supp. 22-3603. In reviewing the granting or denial of a motion to suppress evidence, this court must determine whether the factual findings underlying the trial court's decision are supported by substantial competent evidence. The appellate courts do not reweigh the evidence, reassess the credibility of the witnesses, or resolve conflicting evidence. The ultimate legal conclusion drawn from those factual findings, however, is reviewed under a de novo standard. *State v. Martinez,* 296 Kan. 482, 485, 293 P.3d 718 (2013). However, questions of standing—a component of jurisdiction—are subject to unlimited review on appeal. *State v. Gilbert,* 292 Kan. 428, 431-32, 254 P.3d 1271 (2011).

### The notice of appeal was specific to Judge Welch's rulings.

We begin by clarifying the issues we will examine on appeal. Judge Bennett decided after an evidentiary hearing on March 22, 2103, that both Wilburn and Curtis were unlawfully stopped and detained by police. Under that ruling, Judge Bennett found that the officers had no reasonable and articulable suspicion upon which to base their stop of both men. Accordingly, all evidence obtained after the stop was suppressed. In anticipation of dismissal for lack of evidence, Judge Bennett gave the State a chance to

present an argument at a separate hearing that the evidence would still be admissible based on either the independent source doctrine or inevitable discovery "independent of this suppression ruling." The case was set for such a hearing before Judge Welch. According to the transcript of that hearing, Judge Welch was asked to decide not only inevitable discovery and the independent source doctrine, but also whether Wilburn had standing to challenge Curtis' statements to police and the search of the Kia. Apparently, the parties submitted additional briefing on the topic, but it is not included in the record on appeal. Judge Welch approached the case from the point in time where Judge Bennett had concluded the detention was unlawful. She did not revisit that ruling.

Wilburn argues correctly that appellate jurisdiction only exists when the appeal conforms to statutory requirements. See *State v. Garza*, 295 Kan. 326, 329, 286 P.3d 554 (2012). Moreover, the appellate court only obtains jurisdiction over the rulings identified in the notice of appeal. 295 Kan. at 329. A general notice of appeal may be read liberally to include issues not specifically named, but a "limited and specific" notice limits the appellant to those issues or judgments enumerated therein. See *State v. G.W.A.*, 258 Kan. 703, 707, 906 P.2d 657 (1995); see also *State v. Laurel*, 299 Kan. 668, 673-74, 325 P.3d 1154 (2014) (citing *Gates v. Goodyear*, 37 Kan. App. 2d 623, 626-29, 155 P.3d 1196, *rev. denied* 284 Kan. 945 [2007], for the proposition that a notice of appeal citing two specific district court rulings is insufficient to confer jurisdiction over other issues not addressed in those rulings).

In this case, the State specifically appealed "Judge Sara Welch's order entered on June 26, 2013 suppressing evidence." Judge Welch assumed the correctness of Judge Bennett's ruling and went on to address the issues she was asked by the parties to decide. Accordingly, Wilburn argues that the court does not have jurisdiction to consider Judge Bennett's ruling because it is not mentioned in the notice of appeal. We agree but find that even if we consider the sole issue decided by Judge Bennett, that being the legality of the stop, we would not reach a different conclusion than Judge Bennett.

*The stop of Wilburn was not based upon a reasonable suspicion of past, current, or future criminal activity.*

The parties do not dispute the fact that this was an involuntary stop and seizure. Pierce and Jordan stopped Wilburn and Curtis in or just outside Dillard's through a show of authority. "Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such suspect and an explanation of such suspect's actions." K.S.A. 22-2402(1). "Even a brief seizure must be 'reasonable' under the Fourth Amendment." *State v. Moralez*, 297 Kan. 397, 404, 300 P.3d 1090 (2013). A brief, investigatory detention is *both* constitutional and statutorily permitted if an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime. 297 Kan. at 405.

At the time of the stop, the officers had no reasonable and articulable suspicion that Wilburn or Curtis had committed any crime. Pierce testified that the *sole* basis for the stop was the puppy dog "look." We have no trouble concluding that a puppy dog look is insufficient to establish a reasonable and articulable suspicion of criminal activity. This was nothing more than a hunch. "[A] hunch has never been the benchmark of a proper police seizure." *Martinez*, 296 Kan. at 488. The hunch resulted in Wilburn's arrest and subsequently in Pierce answering Wilburn's phone, which he had seized. Still based upon his hunch, Pierce proceeded to the Chick-fil-A where the whole case started to come together. Therefore, even if Judge Bennett's ruling on the legality of the stop and the resulting suppression of the evidence obtained had been properly appealed, we find it was supported by substantial evidence and we reached the same legal conclusion.

*The Fourth Amendment principles at issue in Judge Welch's rulings are reviewed.*

The Fourth Amendment to the United States Constitution guarantees " '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and sei-

zures.' " *State v. Moralez*, 297 Kan. 397, 404, 300 P.3d 1090 (2013). This right is also present in Section 15 of the Kansas Constitution Bill of Rights. 297 Kan. at 404. When a defendant alleges a violation of these rights and challenges the admission of evidence based on that violation, the State must "establish the lawfulness of the challenged search or seizure." 297 Kan. at 408-09. If the State cannot meet this burden, the exclusionary rule may apply and suppress the evidence. 297 Kan. at 409.

The exclusionary rule is a judicially created remedy which exists to prevent the use of unconstitutionally obtained evidence in a criminal proceeding and applies when such suppression would act to deter illegal conduct by the State. *State v. Karson*, 297 Kan. 634, 639, 304 P.3d 317 (2013). An important part of the exclusionary rule is the "fruit of the poisonous tree" doctrine, which "extend[s] the scope of the exclusionary rule to bar not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search." *State v. Deffenbaugh*, 216 Kan. 593, 598, 533 P.2d 1328 (1975). This doctrine applies to all derivative evidence, be it physical or testimonial. 216 Kan. at 598.

*The district court did not err in finding that Curtis' statement to detectives could not be used against Wilburn.*

When Wilburn and Curtis were unlawfully stopped and detained by police, Curtis told the officers " 'I'm from California' " and " '[w]e arrived in a vehicle.' " Even though Judge Bennett found that the stop was unlawful and the evidence should be suppressed, the State asserts that Wilburn lacks standing to challenge the statements made by Curtis. Accordingly, it seeks the ability to use these statements against Wilburn in an effort to connect him to the Kia with a California license plate. Because the facts are not in dispute, we review the court's legal conclusion de novo.

In support of this contention, the State relies primarily on cases involving *Miranda* warnings rather than those involving the Fourth Amendment—and overlooks the clear guidance provided by *State v. Hodges*, 252 Kan. 989, 851 P.2d 352 (1993). There, an officer trailed a slow-moving car for quite some time, suspicious that the

car might be involved in some of the many burglaries that recently occurred in Manhattan's business district. Another officer finally stopped the car as it neared the interstate, but without witnessing a traffic infraction and without "reason to believe that the suspects were trying to flee or elude [the officers] or that a crime was going to be committed." 252 Kan. at 991. The driver consented to a search of the car, where burglary tools (screwdrivers and a pry bar) were discovered. The next day, after being arrested and charged, one of the passengers confessed, implicating another passenger, Hodges, in a number of business burglaries. The district court suppressed the evidence and the passenger's confession as fruit of the illegal traffic stop.

On appeal by the State, our Supreme Court took up a number of issues, including Hodges' standing to challenge the other passenger's statements. 252 Kan. at 1002. Although the State contended that Hodges' argument amounted to a vicarious assertion of the passenger's Fourth Amendment rights, the court rejected this assertion. 252 Kan. at 1003-05. Instead, the court observed that "Hodges was subject to the illegal car stop and is arguing that the confession is fruit of the poisonous tree" and that, as such fruit, "the defendant had standing to seek suppression of [the passenger's] confession." 252 Kan. at 1005. However, the court ultimately refused to suppress the passenger's confession because it was sufficiently separated from the illegal stop; specifically, the confession occurred the next day after he requested to speak to police in an effort to make a deal that would benefit him. In other words, the court applied the attenuation doctrine to allow the confession into evidence. 252 Kan. at 1008-09.

Like *Hodges*, Wilburn sought to suppress Curtis' statements only as fruits of the shared illegal stop. But unlike *Hodges*, the State raises no argument in favor of attenuation or any other break in the chain of events between the illegal stop and Curtis' statement—nor could it successfully make such an argument. As such, Wilburn clearly had standing to object to the use of Curtis' statements, and the district court's decision in that regard is affirmed.

*The district court's finding that Wilburn lacked standing to challenge the search does not lead to the conclusion that the evidence found in the Kia is admissible.*

The district court found that the Kia was stolen and, therefore, Wilburn did not have standing to challenge its search. But Judge Welch went on to conclude that the evidence recovered from the Kia was inadmissible regardless of Wilburn's standing to challenge the search because it would not have been discovered but for the illegal stop and, as such, was the fruit of the illegal stop and seizure. The State, however, argues that Wilburn's lack of standing requires reversal of this decision.

It appears that the State's position is that Wilburn's lack of standing to challenge any search to the Kia controls the admissibility of the evidence—illegal seizure or not. But a defendant's standing to challenge the search of a vehicle is not always determinative of the search's admissibility. In *State v. Epperson*, 237 Kan. 707, 703 P.2d 761 (1985), an officer on patrol in the early hours of the morning noticed a parked BMW with two men inside. The men appeared to be startled by the patrol car and, after some action inside the car, exited the vehicle and began to walk away. The officer exited his vehicle, caught up to the men, and spoke to them; they avoided directly answering his questions. When the officer looked inside the BMW, which was unlocked and had its window rolled down, he discovered an axe and two baggies that likely contained cocaine in the car. He arrested the two men, but the district court suppressed the evidence in the car because "the officer did not have a reasonable or articulable suspicion of criminal activity to justify an investigative stop" and "the initial seizure of the defendants, the search of the car, and the seizure of the cocaine was unlawful." 237 Kan. at 709. The State appealed first to this court and then to our Kansas Supreme Court.

After finding that the officer lacked grounds to stop the two men and that his search of the car was unlawful, our Supreme Court moved on to a third question: Could the evidence found in the car be admitted into evidence against the car's passenger? 237 Kan. at 714-16. Examining the relevant caselaw, the court determined that

the passenger lacked standing to challenge the unlawful search because he failed to meet his burden to establish that the search violated his Fourth Amendment rights. 237 Kan. at 716-17. But the passenger also contended that the evidence found in the car constituted the fruit of the illegal stop and seizure. Our Supreme Court observed the following:

"We have held, and the rule is generally, that a passenger has no standing to challenge the search of a car which does not belong to him. Here, however, the initial stop and seizure of both [men] was illegal, and we have so held. The search of the car followed quickly upon the heels of that illegal seizure. It would not seem logical to permit the evidence to be used as against the former passenger and not as against the former driver." 237 Kan. at 717.

Because the stop was illegal, the passenger's rights were violated, and his "right to challenge the search stem[med] not from the fact that he was previously a passenger in the motor vehicle, but because he is a person who was unlawfully stopped and seized, and because the search followed as a consequence thereof." 237 Kan. at 718. As such, the court upheld the suppression of evidence. 237 Kan. at 718.

The United States Court of Appeals for the Tenth Circuit has held similarly, explaining:

" 'This court has repeatedly recognized that although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the [defendant's] illegal detention.' [Citations omitted.]" *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001).

Other federal courts of appeals agree with this conclusion. See *United States v. Bueno*, 703 F.3d 1053, 1059 n.3 (7th Cir.), *vacated on other grounds by Gonzalez-Zavala v. United States*, 569 U.S. \_\_\_\_, 133 S. Ct. 2830 (2013); *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001) ("Even though [defendant] lacked a possessory or property interest in the motor vehicle that would enable him to directly challenge the search, he may still contest the lawfulness of his own detention and seek to suppress evidence as the fruit of his illegal detention."). In a case involving a passenger who challenged

guns found in a car as the fruits of an illegal traffic stop, the Third Circuit cautioned:

"But we should not be distracted by the fact that this case involves evidence found in a car. This is not an 'auto search' case. The search of the car is not before us; the seizure of [the defendant] is. This case is about an illegal seizure by the police of the defendant, pursuant to which evidence was discovered. The violation of [the defendant's] Fourth Amendment rights was the traffic stop itself." *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006).

Moreover, the Tenth Circuit has more broadly rejected "the proposition that the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding both the *violation* which constitutes the poisonous tree *and* separate standing regarding the *evidence* which constitutes the fruit of that poisonous tree." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1118 (10th Cir. 2006). In discussing whether a defendant could challenge the contents of his immigration and criminal record "A-file" as fruits of an illegal stop, the court explained: "A defendant's standing to challenge the admissibility of evidence deemed fruit of an illegal search and seizure therefore arises from the alleged violation of his Fourth Amendment rights by virtue of the primary illegality." 458 F.3d at 1117, 1119. As such, "[t]here is no independent requirement that a defendant also have standing or a proprietary interest in the items sought to be suppressed under the fruits of the poisonous tree doctrine." 458 F.3d at 1119.

Although *Epperson* and *Olivares-Rangel* involve slightly different fact patterns than those at issue here, the principle guiding those cases—namely, that a defendant may challenge derivative evidence from an illegal seizure of his or her person regardless of his or her interest (or lack of interest) in that evidence—is sound when applied to the facts of this case. This case, like *Mosley*, revolves around an illegal stop and detention, not the search of an automobile. Pierce and Jordan lacked reasonable suspicion to stop Wilburn; as a result of their illegal actions, a string of events unraveled, ultimately leading the detectives to the Kia and the evidence within. The illegality of that stop is unaffected by Wilburn's lack of possessory or ownership interest in the Kia, and the violation of his rights is not somehow cured by this lack of interest. The

evidence was uncovered as a result of that initial illegal act and must therefore remain suppressed.

As ancillary to this argument, the State contends that either Wilburn or Curtis threw away the keys to the Kia, thereby intentionally abandoning it. It is well established that "an individual who abandons property is not permitted to contest the legality of the search and seizure of the property." *State v. Ralston*, 45 Kan. App. 2d 1024, 1027-28, 257 P.3d 814 (2011), *rev. denied* 293 Kan. 1112 (2012). Aside from the fact that nothing in the record indicates that Wilburn and Curtis purposely threw away the keys—let alone with the intention to abandon the Kia—the foregoing analysis still applies. Wilburn's stop remains illegal, and the discovery of the Kia remains the last event in the chain that began at that stop. As such, the district court's decision suppressing the evidence from the Kia, even though Wilburn had no possessory interest in the Kia, is affirmed.

*The inevitable discovery doctrine does not apply here.*

The State lastly argues that the inevitable discovery doctrine applies and renders the evidence in the Kia admissible. The State predicates this argument on two assumptions: (1) that Curtis' statements, if admissible, would have provided a prompt link between the Nordstrom fraud and Wilburn; and (2) that Wilburn and Curtis would not have been able to recover the Kia's keys.

If the prosecution can establish by a preponderance of the evidence that otherwise unlawfully obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible under the inevitable discovery doctrine. The burden is on the State to demonstrate ultimate admissibility. *State v. Stowell*, 286 Kan. 163, 166, 182 P.3d 1214 (2008). Importantly, "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix v. Williams*, 467 U.S. 431, 444 n.5, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). As noted by this court in *State v. Mollett*, No. 97,999, 2008 WL 3852167, at *12 (Kan. App. 2008) (unpublished opinion), *rev. denied* 287 Kan. 768 (2009), "the inevitable discovery exception does not invite speculation about the

possible series of events under which the evidence may have been discovered, but requires an affirmative showing of a reasonable probability that the evidence would inevitably be discovered through lawful means already initiated when the seizure was made."

At the hearing before the district court, the State elicited testimony in support of this position. Its path to inevitable discovery, as demonstrated by the testimony, is essentially as follows:

- After remaining in the parking lot for 5 days, the Kia would have been towed.
- Enterprise would have collected the car from the tow company.
- Enterprise would have inspected the Kia and inventoried its contents.
- Suspicious of the personal property left inside the vehicle, Enterprise would have contacted law enforcement.
- Law enforcement would have recognized the property as evidence of fraud.
- Law enforcement would have contacted the Secret Service for assistance with the investigation into the suspicious items in the Kia.
- The Secret Service would have used the items within the car, as well as their internal agency resources, to tie the Kia to Carroll and Wilburn.
- The Secret Service would have also used the evidence from the Kia to find the area stores that Wilburn and his compatriots had defrauded.
- Russell and Pierce would have spoken about the Nordstrom fraud at some point, leading the men to discuss Curtis' statements about California and further tying all the pieces together.

But the State's sequence of events is predicated both on the admissibility of Curtis' statements, which we have found were not admissible, *and* on the assumption that the Kia would have remained in the parking lot for 5 days. Even assuming that Curtis' statements about coming from California were admissible, nothing

in the record indicates that the Kia would not have been recovered by either Wilburn or one of the other suspects. In fact, Carnales, the director of mall security, testified that one recovers lost property by describing the item and showing identification. Security then records the exchange and returns the property to its owner. It is logical to assume that one of the four suspects would have recovered the keys from the mall security office at some point that same day and driven the Kia away, especially given the keys had been recovered and were safely held in the mall security office. In fact, had Wilburn not been detained, he likely could have recovered the Kia himself.

Moreover, many of the other links in the State's inevitable discovery chain are very tenuous ones. Russell testified that, but for his phone call with Pierce, he likely would not have investigated the Nordstrom call or looked for the vehicle associated with that incident until the next day. Hatch testified that the information he recovered from the other stores occurred after the search of the Kia and "outside of five days" from the initial encounter between Wilburn and the detectives. And every link in the chain—from the tow at the mall parking lot down to the interaction between the Secret Service and local law enforcement—is predicated on prompt action by each individual and agency involved. The situation is simply too speculative to constitute inevitable discovery.

The State attempts to analogize this case to those where discovery of the incriminating evidence would be fairly immediate. See *State v. Walker*, 283 Kan. 587, 604-05, 153 P.3d 1257 (2007) (the independent police investigation, when combined with the defendant's admissible statements, would have uncovered the vehicle used in the crime); *State v. McKessor*, 246 Kan. 1, 7-8, 785 P.2d 1332 (1990) (apart from the public safety exception, the gun would have been discovered approximately 2 hours later pursuant to a valid search warrant); *State v. Waddell*, 14 Kan. App. 2d 129, 134-35, 784 P.2d 381 (1989) (the illegally frisked defendant would have been taken to jail and processed regardless of the search). But the facts in those cases, unlike the facts in the instant case, are quite straight-forward. In contrast, the State in *State v. Mollett*, No. 97,999, 2008 WL 3852167 (Kan. App. 2008) (unpublished opin-

ion), *rev. denied* 287 Kan. 768 (2009), essentially argued that even had officers not illegally stopped a car parked in a high-crime area, they would have run the tags, learned of the driver's outstanding warrant, arrested him, and impounded the vehicle, thereby discovering stolen property during an inventory search. This court rejected that argument as too speculative as there was no concrete evidence demonstrating that the officers would definitely have discovered the driver's warrant, arrested him, and impounded the vehicle, which he did not own. 2008 WL 3852167, at *11-12. Similarly, in *State v. Flesher*, No. 94,175, 2006 WL 1379606, at *4 (Kan. App. 2006) (unpublished opinion), *rev. denied* 284 Kan. 948 (2007), this court rejected the inevitable discovery doctrine because the facts required the State to "heap conjecture onto speculation to construct a scenario in which" the defendant would leave a party drunk and somehow encounter law enforcement who would then "identify him as a probable underage drinker."

Both *Mollett* and *Flesher* involve situations in which discovery of the evidence at issue was certainly *possible*, but not inevitable. In this case, the Kia likely would not have been towed until at least 5 days after the police encountered Wilburn and Curtis. Wilburn and Curtis could have easily recovered the keys within those 5 days. Even if the car were towed, Enterprise would still need time to inspect it, find the suspicious contents, and contact law enforcement; even with that contact, local law enforcement and the Secret Service would need to interface effectively to uncover Carroll's and Wilburn's connections to the Kia—and then, to the fraud at Oak Park Mall.

This court reviews factual findings under the substantial evidence standard. *Martinez*, 296 Kan. at 485. Substantial evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012). Given the frankly improbable chain of events that unraveled at Oak Park Mall in February 2012 and the equally unlikely chain of events required to discover the Kia without first detaining Wilburn and Curtis, it is clear that the district court's conclusion was supported by substan-

tial evidence. It is also legally sound. As such, its decision is affirmed, and the evidence from the Kia was properly suppressed.

We pause to note that the State fails to brief the argument it made in district court concerning the independent source doctrine. Accordingly, we view it to have abandoned any such claim and we will not address it here. See *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013) (an issue not briefed by the appellant is deemed waived and abandoned).

Affirmed.