No. 116,228

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RALFEAL ERON CARR,
*Appellant.*

SYLLABUS BY THE COURT

1.

The Fourth Amendment to the United States Constitution protects us from unreasonable searches or seizures. A vehicle stop is a seizure under the Fourth Amendment.

2.

To lawfully stop a vehicle to investigate a crime (an investigatory detention), officers must have reasonable suspicion—an objective and specific basis for suspecting that the person being stopped is involved in criminal activity, either because the person is committing a crime, has committed a crime, or is about to commit a crime. What is reasonable depends on all the circumstances as viewed from the perspective of a trained police officer, but officers must have specific and articulable facts in support of their suspicion for it to be reasonable.

3.

To stop a vehicle based on suspicion that a person properly subject to police investigatory detention is in it, an officer must have specific and articulable facts that the person is in the vehicle. If the officer knows only that a relative of the suspect owns a similar car that had at some point been seen at the suspect's residence, the officer does not have specific and articulable facts to support reasonable suspicion that the suspect is in the vehicle at a later time.

4.

When police perform an unconstitutional search or seizure, the exclusionary rule generally bars the admission and use of the evidence obtained in a criminal trial. Because the exclusionary rule is a court-made remedy designed to deter improper police conduct, it is subject to several exceptions. One is the inevitable-discovery exception, which allows the admission of otherwise unconstitutionally obtained evidence if the police eventually would have found that evidence by lawful means.

5.

In this case, the defendant's cell phone was obtained by police through an unlawful car stop. Police then used that cell phone to determine the defendant's cell-phone number and to obtain relevant phone records. But officers would have discovered the same information even if they had not used the cell phone. The database that officers use to review phone records indicated that the phone number likely belonged to the defendant. Likewise, the same phone number appeared in a rap-music video that the defendant made. Under these circumstances, the district court properly concluded that officers would have inevitably discovered the same phone records even if they had not used the cell phone obtained through an unlawful car stop.

6.

Because the only evidence supporting the defendant's marijuana-possession conviction was found after an unlawful car stop, the defendant's conviction must be reversed.

7.

Even a trial error that infringes upon a defendant's constitutional rights may be declared harmless if the State proves beyond a reasonable doubt that the error did not affect the trial's outcome in light of the entire record.

8.

In this case, the defendant was connected to a vehicle used in a drive-by shooting in part because officers found a car key in his pocket during an unlawful car stop that took place the day after the shooting. Based on our review of all the evidence in the case, we cannot say beyond a reasonable doubt that the admission of the key and other inadmissible evidence obtained through the unlawful car stop had no effect on the jury's verdict. We therefore reverse the defendant's conviction for aggravated battery and remand the case for a new trial.

9.

Under the business-records exception to the hearsay-evidence rule, records of acts or events may be offered for their truth if the judge finds that (1) they were made as part of regular business operations at or about the time of the acts or events and (2) the sources of information for the records indicate they are trustworthy.

10.

An appellate court reviews a district court's decision to admit business records only for abuse of discretion, meaning that we reverse only if the district court's decision is one no reasonable person would agree with or was based on a legal or factual error.

11.

Information collected by reliable computer systems in the regular course of business and then compiled into a document by a business employee is generally admissible under the business-records exception. The district court did not err when it admitted cell-phone records maintained in the ordinary course of business by a cell-phone provider.

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed October 27, 2017. Reversed and remanded with directions.

*Christopher M. Joseph* and *Carrie E. Parker*, of Joseph, Hollander & Craft LLC, of Topeka, for appellant.

*Jodi Litfin,* deputy district attorney, *Michael F. Kagay*, district attorney, and *Derek Schmidt,* attorney general, for appellee.

Before GREEN, P.J., BUSER and LEBEN, JJ.

LEBEN, J.: Ralfeal Eron Carr appeals his convictions for possession of marijuana and aggravated battery, the latter conviction based on Carr's alleged participation in a drive-by shooting and police chase. Carr argues that significant evidence against him for both charges came from an unlawful car stop and shouldn't have been admitted. We agree: officers lacked reasonable suspicion to believe Carr was in the vehicle they

4

stopped. Accordingly, the marijuana found after the stop in his pocket can't be used as evidence and Carr's marijuana-possession conviction must be reversed.

The State used additional evidence found through the unlawful car stop to support Carr's aggravated-battery conviction; the State argues that we should find any error in the admission of that evidence harmless. But on the standard that applies here, we can only find the error harmless if we conclude beyond a reasonable doubt that its admission didn't lead to Carr's conviction. We are unable to make that finding here. One of the items found on Carr was a key to the vehicle apparently used in the drive-by shooting. While there was other circumstantial evidence that Carr had been in that vehicle when the crime was committed, having the vehicle key in his possession only a short time later formed a critical link. Given the circumstantial nature of the case, we cannot conclude beyond a reasonable doubt that the jury would have convicted Carr without the evidence illegally obtained at the car stop. We therefore reverse his aggravated-battery conviction as well and send the case back to the district court for a new trial on that charge.

FACTUAL AND PROCEDURAL BACKGROUND

Two shootings in Topeka in July 2015 are at the heart of this case. On July 17, Royelle Lamont Miller was outside in front of his house when someone in a car driving by shot him. The next day, someone shot and killed Antwon Love. (Since we will refer to several people from the same family and none of the significant parties or witnesses have the same first name, we will generally refer to the witnesses and actors by their first names.)

Shortly after Royelle was shot, around 9 p.m., Officers Barry Nelson and Scott Koch from the Topeka Police Department saw a dark-colored Dodge Durango blow through a stop sign in the Hi-Crest neighborhood. The officers attempted to stop the Durango, but after initially pulling over, it sped away, resulting in a police chase. During

5

the chase, the Durango ran through a second stop sign going approximately 70 miles per hour. At some point, the officers lost sight of the Durango, but they later recovered a gun they believed was thrown from it during the chase.

Around the same time, the officers learned that a shooting had occurred nearby, so they responded to that scene. Royelle, who had been outside the house at the time of the shooting, had been shot in his leg. He said a dark-colored car drove by when he was shot but he did not see who shot him.

Andre Wallace and Jesse Hughes were also there when Royelle was shot, and police found some bullet holes in the house. Andre initially told police that he was in the house and did not see the shooting. He later testified at trial that he could not remember what had happened or where he had been. Jesse testified that he "heard gun shots and hit the floor." After Royelle was shot, Jesse walked away from the scene.

Police then spoke with Andre's mother, Wanda Wallace, who lived next door. Officer Nelson testified that Wanda said she had seen someone driving around the block several times earlier that day in a black SUV "holding his head and making threats." Wanda allegedly told Nelson that she wasn't sure of the person's name but knew that he was related to the Kelleys and lived in a yellow house across the street from the Kelleys. Based on his knowledge of the Kelleys and the neighborhood, Nelson asked her if the person's name was Ralfeal Carr, and she said yes. Wanda later spoke with a detective and told him a similar account, telling him that Andre and Carr had "bad blood." But at trial, Wanda said she did not remember anything that had happened, generally refused to answer questions, and continually asked to go home while on the stand, even after confronted with video footage of her speaking with police.

While Nelson was speaking with Wanda, Georgia Kelley arrived. Georgia owned the Durango that had led officers on the chase. She initially told police that she had

6

loaned her Durango to her nephew Carr that day. Georgia later testified at trial that she had loaned the car to her other nephew, Antwon.

Antwon was killed the next day, July 18, near the site of the first shooting. Police speculated that his murder might have been in retaliation for the shooting of Royelle the day before.

On the day Antwon was killed, officers were in the neighborhood trying to gather more information about the shooting of Royelle and saw a black Ford Explorer. Nelson associated the Explorer with Carr, so he stopped it. Carr and his aunt, Georgia, were in the Explorer; Georgia was driving and Carr was in the front passenger seat. The officers arrested Carr and searched him as part of the arrest, finding a Dodge car key, a cell phone, and over $5,000 in cash in his pocket. At the police station, officers again searched Carr and found a piece of loose marijuana in his front left pocket.

Without a search warrant, police used Carr's cell phone to determine its phone number. Police then sent a letter to the associated cell-phone company, Verizon, to preserve the data related to the phone number until police could get a search warrant for the records. After police got a search warrant, Verizon produced the records, and the police were able to use cell-tower information from the records to locate the Durango in the garage of William Lewis' house.

Lewis testified that Antwon had showed up around 10 p.m. on the night of the shooting and asked if he could put his Durango in the garage. According to Lewis, Antwon said that he had had a fight with his girlfriend and wanted to hide his car so she wouldn't damage it. Police later confirmed that the Dodge key found on Carr belonged to the Durango.

7

On further review of the cell-tower information in Carr's phone records, police determined that Carr's phone was in the area where police pursued the Durango, where the shooting of Royelle occurred, and, shortly after that shooting, the Lewis residence, where the Durango was later found.

The State charged Carr with aggravated battery, criminal discharge of a firearm at an occupied dwelling, eluding police, possession of marijuana, speeding, and two counts of failure to stop at a stop sign.

Before trial, Carr filed a motion to suppress some of the evidence, arguing that officers had violated his constitutional rights by stopping the Explorer without sufficient legal cause and by using his cell phone to get the number without getting a search warrant. The district court concluded that although the vehicle stop was lawful, the police had committed an unlawful search of Carr's cell phone. See *Riley v. California*, 573 U.S. ___, 134 S. Ct. 2473, 2493-94, 189 L. Ed. 2d 430 (2014) (holding that police should generally get a search warrant before searching an arrested defendant's cell phone). Nevertheless, the district court concluded that the State could use the cell-phone records at trial because police would have inevitably discovered Carr's cell-phone number by other lawful means and used it to get a search warrant.

After a four-day jury trial, the jury found Carr guilty of aggravated battery and possession of marijuana but not guilty of the other charges. The district court sentenced Carr to 100 months in prison for aggravated battery plus 12 months in the county jail for the marijuana conviction, with the county jail time to begin after the prison sentence.

Carr then appealed to our court.

ANALYSIS

Carr's primary argument on appeal is that the police didn't have legal cause to stop the Ford Explorer, so the stop violated his constitutional rights. Because the car stop was unlawful, Carr contends that the district court should have granted his motion to suppress the evidence found in it—the marijuana, the Dodge Durango key, the $5,000 in cash, and his cell phone. Carr also argues that without the cell phone, the State would not have obtained his cell-phone records, so they too should have been excluded.

If Carr is right and all of this evidence should have been excluded, then his convictions cannot stand. The State concedes that the marijuana conviction cannot stand if the car stop was unlawful. And the evidence on the aggravated battery charge was greatly strengthened by evidence found as a result of the stop—the Durango key and the cell-phone records.

When the defense files a motion to suppress evidence arising from a police stop, the State has the burden of proof to show that the stop was lawful. See *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016). On appeal, we must accept the factual findings of the district court when substantial evidence supports them. We then review the legal conclusions to be drawn from those facts independently, with no required deference to the district court. *State v. Howard*, 305 Kan. 984, 988-89, 389 P.3d 1280 (2017).

The Fourth Amendment to the United States Constitution protects us from unreasonable searches or seizures. A vehicle stop is a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *City of Atwood v. Pianalto*, 301 Kan. 1008, 1011, 350 P.3d 1048 (2015). The parties agree that the officers' stop of the Explorer was an investigatory stop, also known as a *Terry* stop, named after the United States Supreme Court decision, *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). To lawfully conduct a *Terry* stop,

officers must have reasonable suspicion—an objective and specific basis for suspecting that the person being stopped is involved in criminal activity, either because the person is committing a crime, has committed a crime, or is about to commit a crime. *State v. Martinez*, 296 Kan. 482, 486, 293 P.3d 718 (2013); K.S.A. 22-2402(1) (codifying rule that law enforcement may stop a person in a public place when the officer reasonably suspects the person "is committing, has committed or is about to commit a crime"). Reasonable suspicion is a lower standard than probable cause, which exists when a person of reasonable caution could conclude from the known facts that a crime has been or is being committed. *State v. Keenan*, 304 Kan. 986, 994, 377 P.3d 439 (2016); *Martinez*, 296 Kan. at 487. What is reasonable depends on all the circumstances as viewed from the perspective of a trained police officer, *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017), but officers must have specific and articulable facts in support of their suspicion for it to be reasonable. *State v. Chapman*, 305 Kan. 365, 370, 381 P.3d 458 (2016).

In this case, officers testified at the hearing on Carr's motion to suppress evidence that they stopped the black Ford Explorer because one of the officers associated it with Carr and they were looking for Carr in connection with the recent shooting. What's critical, though, is the basis for that association. Did the officers support the claim of reasonable suspicion with specific and articulable facts?

Officer Nelson explained that he associated the Explorer with Carr because Nelson knew that a relative of Carr owned a black Explorer, the relative had a son or other relative who had appeared in Carr's rap videos, and the officer had seen the vehicle at Carr's house before:

> "The [Dodge Durango] that we pursued that day was registered to a Georgia Kelley. The Kelleys, I know, are associated with Mr. Carr. They are a relative in some way. I know that Jacqueline Kelley had a black Ford Explorer. Jacqueline Kelley has a

10

son or some relative that is named Marcus Henderson and Mr. Carr's rap videos, Marcus Henderson is in most, if not all, of [Carr's] rap videos and I've also seen that Explorer at [Carr's] house on Bryant before."

Nelson acknowledged that he had not seen a traffic violation and could not see who was in the Explorer before he stopped it. Thus, there was no basis for the *Terry* stop except in an attempt to find Carr, a suspect in the shooting of Royelle.

Nelson said that he would not have stopped all of Carr's relatives, only those whose vehicles he associated with Carr. Nelson said he associated Carr with three vehicles: the Dodge Durango, the Ford Explorer, and a white Cadillac that had appeared in Carr's rap videos. Nelson said he did not think that Carr owned any vehicles himself. Nelson said that, in his experience and training, "a lot of these people" registered their cars in other relatives' or friends' names.

In its written order considering Carr's motion to suppress evidence, the district court concluded that Nelson "had a reasonable and articulable suspicion that [] Carr was in the Explorer and that he had committed a crime" based on the officer's "knowledge of Carr's association with the Ford Explorer and his knowledge that Carr was a suspect in the fleeing and eluding and the shooting [of Royelle]." The central question is whether a wanted person's "association" with a car alone gives an officer reasonable suspicion to stop that car without other facts or information that suggest the wanted person is in the car on that particular day. Put another way, how closely associated with a vehicle must a suspect be to justify a *Terry* stop?

Past cases from our court provide some guidance. In *State v. Steen*, 28 Kan. App. 2d 214, 216-18, 13 P.3d 922 (2000), our court suggested that a wanted person's association with a car based on having been a passenger or driver in the past would be sufficient to establish reasonable suspicion. Police stopped a car in which a black man

11

and a black woman were riding after running the license plate in a computerized database. That check established that a black male named Damon DeWayne Steen was "associated with" the car and that a person by that name had an outstanding warrant. Our court concluded that the officers didn't have enough information to form reasonable suspicion that the black man in the car was Steen because there was no information about how Steen was "'associated with'" the car. We set aside the district court's order denying the suppression motion but remanded the case for a hearing at which the State could attempt to show that the database included only those "associated with" cars because they had previously driven or ridden in the car or to present evidence that the police officer had specific information from the database or elsewhere to establish such a link. 28 Kan. App. 2d at 218. In essence, the *Steen* court implied that association with a car based on having been a driver or passenger would give officers reasonable suspicion that the wanted person would be in the car at some future time. 28 Kan. App. 2d at 216.

We found insufficient support for reasonable suspicion in *State v. Smith*, No. 89,465, unpublished opinion filed April 25, 2003. Before conducting the car stop in this case, the officer knew that there was possibly an active arrest warrant for Francisco Esparza; that Francisco had been known to use cars registered to Anna Esparza; that the car in question was registered to Anna; that the car was associated with Francisco; and that two males were in the car. We concluded in *Smith* that while the officer's personal knowledge of Francisco's association with the car might satisfy the minimal requirements in *Steen*, the circumstances in the case did not rise to the level of reasonable suspicion. Specifically, the officer had no specific basis for believing that Francisco was in the car at that particular time:

> "Furthermore, even assuming that the officer operated on a good faith belief that a warrant for the arrest had been issued with respect to Francisco Esparza and that Francisco Esparza had previously been known to use this particular car, the officer articulated no basis for believing that Francisco Esparza was inside the vehicle on this

12

particular morning. The officer testified that he could only identify that the vehicle's occupants were both males. The officer provided no physical characteristics which would make it reasonably likely that Francisco Esparza drove the vehicle rather than another individual. In fact, the officer admitted that he would have likely stopped the vehicle on the mere possibility that Esparza was in the vehicle." *Smith,* slip op. at 6.

Recently, our court concluded that an officer's personal knowledge that a wanted person was associated with a car's registration coupled with other circumstances created reasonable suspicion to stop that car. In *State v. McQueary*, No. 115,210, 2017 WL 2713022 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* July 19, 2017, an officer was routinely running car tags when he ran a tag for a Cadillac that came back as registered to a person wanted on an arrest warrant. The officer knew that the wanted person was associated with a dark gray Cadillac, though he did not know it was that particular Cadillac until he ran the tags. In addition to having the "tag [come] back to" the person wanted on the warrant, the officer also witnessed the driver engage in odd, evasive behavior at a gas station. 2017 WL 2713022, at *1. A court must consider all the circumstances, and here we concluded that the officer's personal knowledge of the link between the wanted person and a dark gray Cadillac, the result of the tag check, and the observations of suspicious behavior gave the officer reasonable suspicion to stop the car. 2017 WL 2713022, at *4.

We have found a few cases from other jurisdictions that provide useful guidance. These courts generally have found that if the officer has nothing more than knowledge of a close relationship between the suspect and the owner of the vehicle or that the suspect had previously driven or ridden in the car, that doesn't give the officer sufficient specific and articulable facts to support a reasonable suspicion that the suspect will be in the car at the time of the stop.

In *United States v. Hudson*, 405 F.3d 425 (6th Cir. 2005), police had received an anonymous tip that a woman police believed to be the girlfriend of the suspect would

arrive at her work place at a given time in a particular car. Police claimed that the anonymous tip also said that the woman would be accompanied by the wanted suspect, but the court did not find that the evidence supported that claim. 405 F.3d at 433. Police confirmed where the woman worked, what time she would show up for her shift, and what kind of car she drove. When police saw the woman arrive at work with two male passengers in the car, they approached the vehicle with guns drawn, handcuffed and searched the three, and then identified one of the passengers as the wanted suspect. The United States Court of Appeals for the Sixth Circuit concluded the police had no basis to believe that the wanted suspect would be accompanying his girlfriend to work on the day in question and had made no attempts to reasonably identify one of the passengers as the suspect before stopping the car. 405 F.3d at 433-34, 438. The court held that the "officers' bare hope of finding a suspect at a particular location does not constitute a particularized and objective basis for seizing, even temporarily, a vehicle and its occupants at that location." 405 F.3d at 438.

In *State v. Beltran*, No. 2 CA-CR 2007-0070, 2008 WL 4552869 (Ariz. App. 2008) (unpublished opinion), an officer testified that he had stopped the car because someone with an outstanding warrant had been associated with the car at one time; the officer had not witnessed any other suspicious behavior or traffic violations. The officer also did not attempt to determine whether the driver of the car matched the description of the wanted person. The court concluded that police lacked reasonable suspicion to stop the car because the officer had "only a hunch that, because [the wanted person] had been in the car at some unknown time in the past, he might be there again" and had no information to suggest the person was in the car at the time of the stop. 2008 WL 4552869, at *4.

In *State v. Eleneki*, 106 Hawai'i 177, 181, 102 P.3d 1075 (2004), the Hawai'i Supreme Court concluded that the police had no reasonable suspicion that a wanted man was in Jasmine Eleneki's car merely because he had been in her car the night before.

14

Before stopping the vehicle, officers knew that Eleneki had picked up the man the previous night after he was released from police custody, that the car was at a convenience store, and that there were two passengers in the car. Due to the window tint, police were not able to identify the passengers before stopping the car. The police officer acknowledged that he didn't know whether the wanted man was in the car but hoped he was. The *Eleneki* court concluded that the mere fact that the wanted man had been in the car the night before would not create reasonable grounds for believing that the man would be in the car the following day. 106 Hawai'i at 181.

By contrast, when other courts have held that police had reasonable suspicion to conduct an investigative stop based on a suspect's association with the car, officers have also had other information raising suspicion or had other grounds to suggest that the suspect was in the car.

For example, in *United States v. Moran*, 503 F.3d 1135 (10th Cir. 2007), a landowner reported a trespass and identified the trespasser. She said he was still on the property when officers arrived, and shortly after the woman's report an officer saw a black SUV across the road from the landowner's property. The officer had personal knowledge that the man the landowner had identified as the suspect drove a black SUV. The United States Court of Appeals for the Tenth Circuit upheld the stop, concluding that under all the circumstances—the reliable identification and report from the landowner, the nearby black SUV, and police knowledge that the suspect drove a black SUV—the police had reasonable suspicion that the suspect was in the black SUV and could lawfully stop the vehicle. 503 F.3d at 1141.

In our case, based on the officers' testimony, they stopped the Explorer because one of them associated it with Carr. The officer's association was based on (1) knowledge that a relative of Carr owned a black Explorer and (2) having seen the vehicle at Carr's house. Those facts aren't sufficient to provide reasonable suspicion that Carr was in the

vehicle when it was stopped. In sum, the officers had a hunch or hope that Carr was in his relative's vehicle but no facts or knowledge to support that hunch or hope. See *Hudson*, 405 F.3d at 438. Because the officers lacked reasonable suspicion that Carr was in the Explorer, they had no legal cause to stop the vehicle.

Before we proceed to discuss what evidence should be suppressed based on the illegality of the vehicle stop, we want to note some additional evidence that was presented at the preliminary hearing. That hearing was held to determine whether the State had enough evidence to proceed to trial on the felony charges against Carr. At that time, Nelson testified that by association, he meant that Carr "[h]ad been seen in it, driving it, around it, things of that nature." But at the motion-to-suppress hearing, Nelson testified only that he associated Carr with the Explorer because it was owned by Carr's relative and Nelson had seen it in Carr's driveway before. He did not repeat the claim that Carr had been seen in or had been driving the Explorer, and his testimony on this point at the preliminary hearing didn't indicate that he had personally seen Carr in the Explorer before the day of the stop. We don't know the reason for this difference in testimony, but we must rely on the evidence the State chose to present at the hearing on the motion to suppress evidence. The State had the burden at that hearing to prove the validity of the *Terry* stop and the vehicle search. See K.S.A. 22-3216(2).

When police perform an unconstitutional search or seizure, the exclusionary rule generally bars the admission and use in a criminal trial of the evidence obtained. Because the exclusionary rule is a court-made remedy designed to deter improper police conduct, it is subject to several exceptions. See *Davis v. United States*, 564 U.S. 229, 236, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011); *State v. Dennis*, 297 Kan. 229, 235, 300 P.3d 81 (2013). Carr argues that, in accordance with the exclusionary rule, the district court should have granted his motion to suppress the evidence obtained as a result of the unlawful stop—the key, the cash, the marijuana, the cell phone, and the records associated with the cell phone.

16

The State argues that the cell-phone records were still admissible under the inevitable-discovery exception to the exclusionary rule. The inevitable-discovery exception allows the admission of otherwise unconstitutionally obtained evidence if police eventually would have found that evidence by lawful means. See *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016); *State v. Baker*, 306 Kan. 585, 590-91, 395 P.3d 422 (2017). For the exception to apply, the State must prove by a preponderance of the evidence that the evidence would have inevitably or ultimately been discovered by lawful means. *Baker*, 306 Kan. at 591. A preponderance of the evidence means the evidence establishes that a fact is more probably true than not true. *State v. Lloyd*, 52 Kan. App. 2d 780, Syl. ¶ 2, 375 P.3d 1013 (2016).

Merely because the stop was unlawful does not mean that the cell-phone records were inadmissible. It's true that if police hadn't stopped the car, they wouldn't have had access to the cell phone to determine the phone number. (And the State has not appealed the district court's finding that police conducted an unlawful search of the phone.) But if police had other legal means to obtain the cell-phone number without physical access to the phone, they still could have gotten a search warrant for the records. So we face the same essential question that was before the district court: Would the State have inevitably discovered the cell-phone number in a lawful manner so that it could have gotten a search warrant for the records?

The district court relied on this evidence to conclude that it was more likely than not that the State would have inevitably found the number:

- Nelson testified that another officer confirmed the number for the cell phone found on Carr.
- Nelson said that he entered that number into a special database, which law enforcement uses to search names, phone numbers, and other information, and the results showed the number was a 66 percent match to Carr.

17

- Nelson said that "[one] could look up [Carr's] name in [the database] and the number would come up as being a number associated with [him.]"
- Nelson also said that he could have learned the number from one of Carr's rap videos on YouTube. Nelson said that he had watched the video before the shooting and looked at it again closely after the shooting. He reported that in the video, a text message is displayed on another cell phone; the message says "come in" and appears to be sent to the number of the phone found on Carr. Nelson said that after the message flashes on the screen, Carr and another person walk into a room and act like they are shooting two people inside.

The district court credited Nelson's account that he would have seen the number in Carr's rap video and that a search in a specialized database relied on by police would have linked Carr to the number as a 66 percent match. Its findings are supported by substantial evidence. This isn't a case based on tenuous links and mere speculation of events that would have had to happen for police to discover the number. Cf. *State v. Wilburn*, 50 Kan. App. 2d 663, 682-84, 332 P.3d 199 (2014). Rather, Nelson was reviewing the rap video after the shooting and used the specialized database as part of his investigation. We conclude that it was likely he would have discovered the number by lawful means; police then could have used it to seek a search warrant. The district court did not err in determining that the cell-phone records were admissible under the inevitable-discovery exception to the exclusionary rule.

The State does not address the admissibility of the key or cash and concedes that if the marijuana should have been suppressed, Carr's conviction for possession must be reversed. The only evidence supporting the marijuana conviction stemmed from the unlawful stop—had police not stopped the Explorer, they would not have been able to search Carr and discover the marijuana. Accordingly, Carr's conviction for possession of marijuana must be reversed.

18

We have determined, then, that the key, the cash, and the marijuana should not have been admitted as evidence at trial. While the State did not address admissibility of the key or cash on appeal, the State does argue that any error in admitting improper evidence was harmless in light of the evidence against Carr, which the State categorizes as overwhelming. "[E]ven an error that infringes upon a constitutional right may be declared harmless if the benefitting party proves beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record." *State v. Garcia*, 297 Kan. 182, 197, 301 P.3d 658 (2013).

The key was used to link Carr to the Durango. The cash was also mentioned at trial, with the prosecutor suggesting in argument to the jury that Carr had the cash because he planned to leave town.

Even without the key and cash, though, the State correctly notes that there was strong evidence against Carr. The remaining evidence included the cell-phone records showing that he could have been at the key locations at the right times, Wanda's initial statement to police that she had seen Carr driving around in a black SUV earlier, and Georgia's initial statement to police that she had loaned her Durango to Carr on the day of the shooting. But Wanda wouldn't repeat those statements under oath at trial, Wanda had also told officers she didn't see the actual shooting, and Georgia said at trial that she had loaned the Durango to Antwon, not Carr. In addition, jurors acquitted Carr of several other charges—criminal discharge of a firearm at an occupied dwelling, eluding police, failing to stop at a stop sign, and speeding.

The acquittal for discharging a firearm at an occupied dwelling is of particular interest because this was the dwelling Royelle was in front of when he was shot. So the jury convicted Carr of shooting at Royelle but acquitted Carr of shooting at the dwelling

19

behind him. Both offenses could have been proved either by evidence that Carr was the shooter or that he aided the shooter in some way in committing these crimes.

In her closing statement to the jury, the prosecutor said the key question was "[w]ho was driving the SUV" because the driver was "clearly the same person who did the running from the cops and . . . the shooting at Royelle." She had emphasized the same point in her opening jury argument when discussing the shots fired at the occupied dwelling: "You can see a bullet hole under the bottom-left corner of that window. . . . There is also a bullet hole in the window. . . . The only issue in this case was who was driving that Durango?"

The jury viewed the case differently, acquitting Carr of fleeing police and shooting into the dwelling but convicting him of shooting at Royelle. If jurors were unsure whether Carr was the driver or a passenger when Royelle was shot, that could explain acquittal on the charges related to fleeing police, but it wouldn't explain acquittal on the charge of discharging a firearm at an occupied dwelling.

The prosecutor emphasized in closing argument the importance of the key found when Carr was stopped. She told jurors that although Georgia testified she had loaned the Durango to Antwon, no key was found with him, while a Durango key "was found in the defendant's pocket, in his front left pocket less than 24 hours after the shooting." Given the circumstantial nature of the evidence placing Carr in the vehicle when shots were fired, the tangible evidence of the Durango key in his pocket less than 24 hours later was significant.

We are unable to conclude, beyond a reasonable doubt, that the improper admission of evidence about the key, the cash, and the marijuana had no impact on the jury's verdict. We therefore reverse Carr's conviction and remand the case for a new trial.

20

We must briefly address one other issue Carr has raised—that the Verizon employee who testified about the cell-phone records, Mark Denton, didn't provide a sufficient basis to admit those records.

The State used Verizon's records of Carr's cell-phone account to show Carr's general location at various times. The State sought to introduce the documents under the business-records exception to the hearsay-evidence rule. Under that exception, records of acts or events may be offered for their truth if the judge finds that (1) they were made as part of regular business operations at or about the time of the acts or events and (2) the sources of information for the records indicate they are trustworthy. See K.S.A. 2016 Supp. 60-460(m); *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 78, 350 P.3d 1071 (2015).

Denton testified that he was a supervisor for the Verizon team that handles court orders and search warrants. He described Verizon's separate sets of records for billing purposes and for network information. He said that a Verizon employee under Denton's supervision had received a search warrant for Carr's records and then had verified the authenticity of the records collected. Denton said the network-information system collects the information in the normal course of business and that employees "go in and pull" the records when requested, putting the information into a readable format and generating a report. Denton said Verizon has the system run performance tests and that algorithms were used to check system reliability. In response to a question from Carr's attorney, however, Denton said he didn't know how the algorithms worked; that was a matter for system engineers.

We review the district court's decision to admit business records only for abuse of discretion, meaning that we reverse only if the district court's decision is one no reasonable person would agree with or was based on a legal or factual error. *Wiles*, 302 Kan. at 74. While Denton couldn't provide some details, like how often performance

21

testing is done or how the algorithms used to check system performance are engineered, he testified that Verizon relies on these records in the ordinary course of its business, that the records couldn't be falsified, and that the person who put these records together did so under Denton's supervision. Information collected by reliable computer systems in the regular course of business and then compiled into a document by a business employee is generally admissible under the business-records exception. E.g., *People v. Zavala*, 216 Cal. App. 4th 242, 247-48, 156 Cal. Rptr. 3d 841 (2013). We find no abuse of discretion in the admission of the cell-phone records.

In addition to that issue about the cell-phone records, Carr raised two other issues on appeal, but we need not address them based on the rulings we have already made. First, he argued that the marijuana charge should not have been joined with the others for trial. Since the only evidence supporting the marijuana charge has been held inadmissible, this issue will not arise at any new trial. Second, he argued that the district court should not have allowed the Verizon employee to testify remotely rather than in the courtroom. That took place based on an unusual series of events that arose shortly before trial. The State will have ample time to obtain an in-person witness at any new trial, so we need not determine whether it was error to allow a Verizon employee to testify remotely under the circumstances that arose at the prior trial.

The district court's judgment is reversed, and the case is remanded for further proceedings.